UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Lawrence Bernard Robbins,     )
                                   )

Plaintiff               )   Civil Action No. ___ – Civ ___ – ____
                                   )

vs.                    )
                                 )    Jury Trial Demanded

Phillip Frost and OPKO Health Inc., )
                                 )

Defendants.          )
_____ )

## COMPLAINT

Lawrence Bernard Robbins ("Robbins") Plaintiff in the above styled cause, sues

Defendants, Phillip Frost and OPKO Health Inc.

This action is filed under §10(b) of the Securities and Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. §78(b), Rule 10b-5 (17 C.F.R. §240.10b-5) and   §20(a) of the Exchange Act,

15 U.S.C. §78t(a):

### I. Jurisdiction and Venue

1.    The First and Second Claims for Relief, asserted in this Complaint, arise under §§10(b) &

20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), as well as Rule 10b-5

promulgated under §10(b) by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction

over the subject matter of this action under 28 U.S.C. §§1331 and 1337 as well as §27 of

the Exchange Act, 15 U.S.C. §78aa.

2.    Further, this Court has pendant jurisdiction over the Third, Fourth and Fifth Claims for

Relief.  Those Claims for Relief are closely related state law claims arising from basically

the same facts as the First and Second Claims.

3.      Venue is proper in this District under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28

U.S.C. §1391(b).  Defendant Phillip Frost ("Frost") resides in the Southern District of

Florida.  OPKO is headquartered and transacts business in Miami, Florida, and a

substantial part of the events giving rise to this litigation took place in this District,

including the dissemination of many of the omissions and untrue statements of fact at

issue.

## II. Securities Fraud Summary

4.      In June 2020, Frost and OPKO agreed to pay $16,500,000 to settle allegations of

securities fraud, §10(b) and Rule 10b-5 of the Exchange Act, and control person liability,

§20(a) of the Exchange Act, brought in a class action. The facts relating to these

allegations were revealed in an SEC complaint on September 7, 2018 that was also settled

by Frost and OPKO.

5.      Frost victimized Robbins, a retired senior, by schemes to defraud or a course of business

that operated as a fraud which violated the Securities Act of 1933, the Securities

Exchange Act of 1934, Florida's Securities and Investor Protection Act and breached his

fiduciary duty to Plaintiff.  Robbins and Frost were friends and colleagues in the medical

field for more than 40 years.

6.      Frost omitted material facts from OPKO's quarterly and annual SEC filings ("10Qs" &

"10Ks"), from 2013 through 2018 including:  a) Frost was a participant in a "pump and

dump" scheme; b) Frost was part of an undisclosed control group in the securities that

OPKO purchased; c) OPKO's 10Ks omitted disclosure that the control group was

manipulating the price of securities; d) OPKO's statement in its 10K filings that it would

fund BioZone Pharmaceutical Inc. ("BioZone") and MabVax Therapeutics Inc. (MabVax)

was untrue.  Frost signed and/or certified the accuracy of OPKO's SEC 10K filings.

7.   Frost, OPKO's controlling person, was responsible for the material omissions in OPKO's 10Qs and 10Ks from 2013 through 2018.

8.   Robbins purchased OPKO common stock deceived by Frost's fraud-on-the-market, his other fraudulent practices and suffered substantial losses to his irreplaceable retirement funds.

### III.  The Parties

9.   Robbins resides in Aventura,  Florida.  Robbins is a retired senior.  From 2013 through 2018, Frost's fraud on the market scheme victimized a retired senior causing substantial losses to his irreplaceable retirement funds.  Robbins and Frost were friends and colleagues in the medical field for more than 40 years.

10.   Frost resides in Miami Beach, Florida.  Frost had a reputation as a successful biotech investor with a following among retail investors, like Robbins.  Frost was the founder, Chief Executive Officer and a Director of OPKO Health Inc., ("OPKO"), a Delaware corporation.  Frost is the trustee managing Frost Gammon Investment Trust ("FGIT").

11.   OPKO's principal place of business is Miami, Florida.  OPKO was described as a purchaser of development stage biotech companies that would be chosen by Frost.  It was listed on the New York Stock Exchange ("NYSE") from September 23, 2013 to June 24, 2016 and on NASDAQ from June 24, 2016 to the present.

### A.   Frost Acted in Concert with Honig and Others

12.   Barry C. Honig ("Honig") resides in Boca Raton, Florida.  Honig is the strategist of the "pump and dump" schemes described in the Complaint filed by the Securities and Exchange Commission ("SEC").  The Complaint was filed in the United States District

Court for the Southern District of New York. 1:18-cv-08175.  Honig acted in concert with Frost, John Stetson ("Stetson"), Michael Brauser ("Brauser"), John R. O'Rourke III ("O'Rourke") , Mark Groussman ("Groussman"), and Alpha Capital named in the SEC Complaint.

### IV.  Frost's Fraudulent Schemes Related to OPKO

13.  From 2013 through 2018, in the risk disclosure section of its 10K filings, Frost was described by OPKO as "essential to our business."  Frost's role was to choose investments based on his knowledge and experience, thereafter OPKO would use its resources to supply the necessary capital.

14.  Frost, as the control person of OPKO, omitted material facts from OPKO's quarterly and annual SEC filings ("10Qs" & "10Ks") that: a) Frost was a participant in a "pump and dump" scheme; b) Frost was part of an undisclosed control group in the securities that OPKO purchased; c) OPKO's 10Qs and 10Ks omitted disclosure that the control group was manipulating the price of securities; d) OPKO's statement in its 10Q and 10K filings that it would fund BioZone and MabVax was untrue.  Frost signed and/or certified the accuracy of OPKO's 10Q and 10K filings.

15.  Frost also omitted to state material facts at institutional conferences sponsored by major brokerage firms and in press releases *i.e.* that an undisclosed control group composed of Frost, Honig and others engaged in a "pump and dump" scheme with BioZone stock. Frost and Honig also concealed acquisitions of BioZone stock for use in the "pump and dump" scheme.

16.  Frost, OPKO and FGIT acquired more than five (5)% of BioZone in furtherance of their schemes to defraud investors, such as Robbins.  The SEC required that Frost disclose his

business intentions pursuant to §13(d) [15 U.S.C. §78(d)] and SEC Rule 13(d)-1(a) [17 C.F.R. §240.13d-1(a)]. Frost and OPKO were required to disclose their business intentions to takeover BioZone by an undisclosed control group including Frost, Honig and their associates, Stetson, Brauser, O'Rourke III, Groussman and their affiliated entities. Significantly, Frost and OPKO failed to do so.

17. After gaining control of BioZone using their accumulated common stock, the undisclosed control group replaced management and engaged in a pump and dump scheme for their own personal financial gain. Further, Frost omitted material facts relating to the termination of the research and development at BioZone. Therefore, Frost withheld information that would have been disclosed on the required Schedule 13D.

18. Moreover, Frost also did not file the required Schedule 13D with the necessary information about OPKO, BioZone, Cocrystal and Southern Biotech, a private company, that Frost and Honig owned. Frost and Honig used Southern Biotech to conceal the true amount of common stock they owned which exceeded the amounts reported violating §13(d) by concealing the schemes to defraud.

**A.** **"Pump and Dump" Schemes**

19. Defendants, in this Complaint and in the SEC Complaint, engaged in "pump and dump" securities fraud schemes. As set forth in the SEC Complaint,

> **"In every scheme, Honig and some combination of . . . [other Defendants] . . . [including] Frost, either explicitly or tacitly agreed to buy, hold, or sell their shares in combination with one another knowing that a pump and dump was in the offing that would allow them all to profit handsomely . . . ."**
> (Emphasis Added) See, SEC Complaint September 7, 2018, p. 2, ¶2.

20.     Honig and his undisclosed control group "pumped" up the price of BioZone and MabVax

stocks in a series of prearranged trades with significantly increasing volume.  Honig,

Frost and other members of the control group "dumped" the artificially inflated BioZone

stock at the expense of other investors, including Robbins.  The control group did not

disclose its pump and dump scheme to public investors.  Public investors were drawn into

these stocks based on the price appreciation with large volume increases.

21.     OPKO, on behalf of Frost, did not file a Current Report on Form 8K, with the SEC, in

October 2013, as required.  Frost and OPKO were required to report their participation in

the pump and dump schemes.  Frost sold 1,987,911 unregistered shares of BioZone

receiving $1,085,321.74 in violation of the anti-fraud provision of §17(a)(2) of the 1933

Act; 15 U.S.C §77q(a)(1) or (2) or (3).  Frost and OPKO were affiliates with BioZone.

Their affiliation limited the amount of shares they could sell.  Frost and OPKO prolonged

their schemes, by not filing the required 8K Current Report with the SEC by omitting

material facts.

22.     Accruing liabilities and/or footnote disclosure in the financial statements of OPKO,

BioZone and MabVax was required.  It was reasonably probable that BioZone and

subsequent "pump and dump" schemes would lead to future litigation, as in fact they did.

Generally accepted accounting principles ("GAAP") required the disclosure of material

liabilities and contingent liabilities in OPKO's financial statements relating to the "pump

and dump schemes" and other fraudulent practices.  Neither OPKO, controlled by Frost,

nor any of the other issuers of the underlying and manipulated securities made these

disclosures.  Frost and OPKO would have increased the risk of regulatory action and civil

litigation had they filed the required Form 8K.

**B.**     **Undisclosed Control Group**

23.     Frost, Honig and OPKO acquired a controlling position in BioZone Pharmaceutical Inc.

("BioZone").  In January, 2014, BioZone merged into Cocrystal Pharma Inc.

("Cocrystal"), a private company owned by a Frost affiliated entity and OPKO, and filed

reports, with the SEC, under the Cocrystal name.  BioZone was engaged in research for a

drug delivery system for a variety of products.  As a condition of the acquisition of

BioZone, Frost made the untrue statement to existing management that OPKO would

fund millions of dollars in research and development.  OPKO did not provide such

funding for research and development as represented in OPKO's 10Ks.

**C.**     **Frost Covered Up When His Schemes Were Exposed**

24.     Honig and Frost worked together on sixteen (16) penny stock deals.  Frost and OPKO

omitted from its 10Qs and 10Ks the continuing relationship between Frost and Honig.  In

December, 2013, an article critical of Honig and Frost was published by Lakewood

Capital Management titled "OPKO Health -- The Placebo Effect."  Honig was described

as a **"serial penny stock promoter."**

25.     The Lakewood article raised material issues regarding Frost and OPKO in respect to their

association with Honig who had previously been the subject of litigation derived from his

penny stock activities.  OPKO and Frost issued a press release and held an investor

conference denying the allegations in the Lakewood article "as distorted and inaccurate

information," without a factual basis.

**D.**     **OPKO's 10Q and 10K Filings Omit Material Facts**

26.     In 2007, Frost created OPKO by merging three companies.  Frost was named CEO and a

Director.  OPKO's risk factors disclosure about Frost states:

"**Our success is dependent to a significant degree upon the efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business.  The departure of our CEO for whatever reason or the inability of our CEO to continue to serve in his present capacity could have a material adverse effect upon our business, financial condition, and results of operations.  Our CEO has a highly regarded reputation in the pharmaceutical and medical industry and attracts business opportunities and assists both in negotiations with acquisition targets, investment targets, and potential joint venture partners. Our CEO has also provided financing to the Company, both in terms of a credit agreement and equity investments.  If we lost his services, our relationships with acquisition and investment targets, joint ventures, and investors may suffer and could cause a material adverse impact on our operations, financial condition, and the value of our Common Stock.**"  OPKO Health, Inc. 2013 10K, p.33, filed March 18, 2014.

27.    From 2013 through 2018, Frost was described by OPKO in its 10K filings as an "essential" person.  Frost's role was to choose investments based on his knowledge and experience, then OPKO would supply the necessary capital.

28.    Frost acted-in-concert with O'Rourke, Honig and others to obtain **". . . favorable and materially misleading articles about the company whose stock price they wanted to inflate."** SEC Complaint, Sept. 7, 2018, p. 3, ¶3. (Emphasis added).  The Authors omitted material facts and misrepresented in their favorable articles that they were not compensated, which was untrue.

**E.    OPKO's Price Rose and Fell Multiple Times**

29.    OPKO stock increased in price substantially on high volume from the BioZone and MabVax pump and dump schemes.  OPKO's stock price  also moved higher on increased volume in response to the press releases and promotional articles that omitted material facts.

30.     OPKO's stock price declined significantly on high volume after the Lakewood article was published and after the SEC Complaint, was filed.  Frost's fraudulent course of business devalued OPKO and depressed the price of OPKO common stock.  These facts confirm Frost's and OPKO's fraud on the market scheme.

**F.      Frost's Schemes to Defraud and/or Fraudulent Course of Business**

31.     All of the above omissions and untrue statements establish schemes to defraud, including a fraud on the market scheme regarding OPKO, which Frost concealed from OPKO shareholders as well as a course of business that operated as a fraud or deceit on Robbins and other OPKO shareholders.

32.     No disclosure was made in SEC filings, institutional conferences, and press releases that an undisclosed control group composed of Frost, Honig and others engaged in a "pump and dump" scheme with BioZone stock. Frost and Honig also concealed acquisitions of BioZone stock for the "pump and dump" scheme.  Frost and OPKO did not file, with the SEC, materially accurate information related to their acquisition of BioZone common stock. Finally, Frost and Honig replaced existing management in order to effect the "pump and dump" scheme.  After the "pump and dump" scheme took place, in September and October, 2013, Frost abandoned BioZone and left OPKO with a worthless asset damaging OPKO's shareholders, such as Robbins.

33.     During 2015 and 2016, Frost, and certain members of the control group, engaged in the same pattern of fraudulent practices in MabVax, a company seeking to produce a cancer drug product. Frost directed OPKO to invest in MabVax.  Frost discussed with existing management investing in research and development of existing and future products. Significantly, the research and development did not take place after Frost, Honig and

other associates acquired control from MabVax management.

34.     In OPKO's 10Qs and 10Ks, press releases, and institutional conferences, public investors

were advised of the MabVax investment.  However, OPKO did not provide funding for

research and development, as represented in OPKO's 10Qs and 10Ks.  Frost, FGIT,

OPKO, Honig,  associated persons and affiliated entities were required by their stock

purchases to file Schedule 13Ds.  Instead, Frost and the other stock purchasers of

MabVax, collaborating as a group, filed untruthful Schedule 13Gs, that they were

"passive investors."  Frost repeated this pattern four times filing untruthful Schedule

13Gs in 2015, 2016, 2017 and 2018.

35.     Frost concealed the schemes, confirming his intent to defraud, by not stating the required

material facts about MabVax on Schedule 13D.  Instead, Frost filed the wrong schedule,

13G, as camouflage.  Schedule 13G included the yearly untrue statement that Frost was a

"passive investor" from 2015-2018.  By filing a Schedule 13G, instead of the required

Schedule 13D, Frost concealed the schemes to defraud resulting in loses to OPKO

shareholders.

36.     Frost, FGIT, Honig and others acting-in-concert bought securities in a target company.

Then, they used their combined shares to obtain control of small biotech companies

which they used in pump and dump schemes to achieve their corrupt objectives.

37.     No disclosure was made about the control group, in OPKO's 10Ks.  No disclosure was

made of the "pump and dump" scheme.  Honig and other members of the control group

did not disclose in OPKO's SEC filings the personal investments they made in MabVax.

Frost and Honig concealed the true amount of shares they purchased in MabVax thru

Southern Biotech to avoid the required federal filing disclosure for  MabVax.  After the

"pump and dump" scheme was completed, MabVax was abandoned and ultimately filed for bankruptcy.  OPKO's investment in MabVax was eliminated in the bankruptcy proceeding. which negatively impacted OPKO.  *In re MabVax Therapeutics Inc. and MabVax Therapeutics Holdings* Inc. ( 1:19-BK-10603-JTD) under §11 of the Bankruptcy Code, March 21, 2019, in the United States District Court in Delaware.

38.     Frost continued to buy OPKO stock in the open market, in support of the fraudulent schemes to keep the price up.  These facts support a strong inference that Frost knew or should have known that his open market purchases would be reported in public SEC filings on Form 4, online and in the financial press.  Further, Frost knew or should have known that investors and shareholders follow insider purchases.  Frost's reputed reputation as a successful, biotech investor, was the "Trojan Horse" that provided a misleading incentive for investors to purchase OPKO stock.

39.     Had OPKO investors, including Robbins, known of Frost's fraudulent course of business, logic dictates that under the circumstances, OPKO investors, including Robbins, would not have purchased OPKO stock.

### V.  Fraud-on-the-market – Presumption of Reliance

40.     Robbins is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted in this complaint against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

41.     Robbins is also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions under the fraud-on-the-market doctrine because, at all relevant times, the market for OPKO common stock was open, efficient, and well

developed for the following reasons, among others:

a.     OPKO common stock met the requirements for listing and was listed and actively traded on the NYSE (from September 23, 2013 until June 24, 2016) and the Nasdaq (from June 24, 2016 to the present), both highly efficient and automated markets;

b.     The price of OPKO common stock reacted promptly to the dissemination of new information regarding the Company.  OPKO common stock was actively traded throughout the relevant time  period, with substantial trading volume and average weekly turnover and high institutional investor participation;

c.     As a regulated issuer, OPKO filed periodic reports with the SEC;

d.     As what the SEC calls a "well-known seasoned issuer," OPKO was eligible to file registration statements with the SEC on Form S-3;

e.     OPKO regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

f.     OPKO was followed extensively by the media, and by securities analysts employed by brokerage firms who wrote numerous analyst reports about OPKO during the relevant time period that were distributed to those brokerage firms' sales forces and certain customers. Each of those reports was publicly available and entered the public marketplace;

g.  The material misrepresentations and omissions alleged in this complaint would tend to induce a reasonable investor to misjudge the value of OPKO securities; and

h.  Without knowledge of the misrepresented or omitted material facts alleged in this complaint, Robbins and other OPKO investors purchased or acquired OPKO common stock between the time Defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed.

42.  As a result of the foregoing, the market for OPKO common stock promptly digested current information regarding OPKO from publicly available sources and reflected the information in OPKO's stock price. Under these circumstances, all purchasers of OPKO common stock during the relevant period suffered similar injury through their purchase of OPKO common stock at artificially inflated prices, and a presumption of reliance applies.

43.  Accordingly, Robbins relied and is entitled to have relied, upon the integrity of the market prices for OPKO's common stock and is entitled to a **presumption of reliance** on Defendants' materially false and misleading statements and omissions.

### VI. Frost's Breach of Fiduciary Duty to OPKO Shareholders

44.  Frost, as the Chief Executive Officer, a Director and Controlling Person of OPKO, was a fiduciary to Robbins, because Robbins was an OPKO shareholder. As a fiduciary, Frost owed a continuing duty of loyalty and due care to Robbins. Therefore, Frost had a duty to disclose all material facts to OPKO shareholders and to abstain from any conflicts of interest, which he did not do.

45.  Frost breached his fiduciary duty to OPKO shareholders including Robbins by putting his financial interests ahead of OPKO shareholders, omitting material facts, making untrue

statements, making false filings with the SEC, employing a fraud on the market scheme,

participating in schemes to defraud and engaging in a course of business which operated

as a fraud or deceit upon unsuspecting OPKO shareholders, including Robbins.

### VII.  Robbins Sustained Losses in OPKO

46.     Frost and OPKO's omissions to state material facts in OPKO's SEC filings, and making

untrue statements in press releases, and at institutional conferences was a fraud on the

market resulting in losses to unsuspecting investors.  Robbins suffered approximately

$8,650,000 in damages.

47.     Frost received proceeds from the BioZone pump and dump scheme in the amount

$1,085,321.74; the SEC obtained disgorgement of $433,181.00, $90,206.00 in interest,

and a civil monetary penalty of $5,000,000.  For his part, Honig received $3,416,455.17

from the BioZone scheme.

### VIII.  The Court Enjoined Frost, OPKO, Honig and Others
### From Their Fraudulent Activities

48.     Frost agreed to restrictive conditions on his activities at OPKO.  Frost consented in the

SEC action to findings of fraud with respect to the unregistered sale of securities and

volume limitations under the Securities Act.  Further, in respect to the Exchange Act,

Frost also consented in the SEC action to factual findings that he was a member of the

undisclosed control group that acquired 5% or more of BioZone and MabVax common

stock.  The United States District Court, for the Southern District of New York, entered

an injunction, based on Frost's consents.

49.     OPKO consented to a $100,000 civil monetary penalty.  In addition, OPKO consented to

factual findings that it was part of the undisclosed control group.  OPKO consented to the

formation of an independent management committee to review Frost's, Frost's controlled

entities and OPKO's minority stock investments for compliance with §13(d) and Rule

13(d)-1(a).  The United States District Court, for the Southern District of New York,

entered an injunction, based on OPKO's consents.

50.    Honig consented to factual findings that he violated the anti-manipulation and anti-fraud

provisions of the Exchange Act.  Honig consented to the fact that he was a member of the

undisclosed control group.  Honig consented that he engaged in the sale of unregistered

securities without regard to the volume limitations.  Honig consented to making SEC

filings with untrue statements.  Disgorgement and a civil monetary penalty for Honig was

deferred until a court hearing is held.  Stetson, Brauser, O'Rourke and Groussman signed

similar consents.  The United States District Court, for the Southern District of New

York, entered an injunction against Honig, Stetson, Brauser, O'Rourke and Groussman,

based on their consents.

## XI.  Plaintiff's Exhibits 1-4

51.    Exhibit 1 is a Complaint filed September 7, 2018 in the United States District Court for

the Southern District of New York by the United States Securities and Exchange

Commission ("SEC").  Exhibit 2 is the Final Judgment and Consent entered against

Phillip Frost by the SEC, dated January 10, 2019.  Exhibit 3 is the Final Judgment and

Consent entered against OPKO Health Inc., dated January 10, 2019.  Exhibit 4 is the

Honig Judgment and Consent, dated July 10, 2019.

## X.  Robbins' Claims Against Frost and OPKO

**A.    The First Claim for Relief is Federal Securities Fraud**

52.   Plaintiff Robbins repeats and re-alleges paragraphs one (1) thru fifty-one (51) as if fully stated herein.

53.   Frost and OPKO violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, by omitting to state material facts, by making untrue statements, making false filings with the SEC, by employing a fraud on the market scheme, by employing a scheme to defraud public investors and by engaging in any act, practice, or course of business which operates as a fraud on any person in connection with the purchase or sale of any security.  Any one of these six fraudulent practices alone is sufficient to establish a violation of §10(b) & Rule 10(b)-5.

54.   Honig and other members of the undisclosed control group artificially inflated the market price of BioZone common stock.  Frost, Honig and other members of the undisclosed control group dumped their artificially inflated BioZone common stock at the artificially inflated price causing damages to BioZone and OPKO investors.

55.   Frost was the controlling person of OPKO, according to OPKO's 10Ks.  As such, Frost was responsible for the omission of material facts related to the fraudulent practices of the undisclosed control group.  Frost and OPKO also issued press releases and made information available at institutional conferences where reference to the undisclosed control group was omitted.  To make matters worse, Frost and OPKO omitted material facts in press releases and institutional conferences related to "pump and dump" schemes in companies OPKO purchased, as a continuing course of business.

56.   Frost denied his preexisting penny stock relationship with Honig "as distorted and inaccurate information."  Frost omitted his intention to work with Honig on future "pump and dump" schemes.  OPKO stock declined significantly in price when the Lakewood

article was published critical of Frost and OPKO.  OPKO's price rebounded after Frost made his untrue denials in an OPKO press release and at an investor conference.

57.     Acting-in-concert, Frost, Honig and other members of the undisclosed control group, through O'Rourke, paid a stock promoter to write a favorable and materially misleading article about BioZone during the BioZone pump and dump scheme.  The stock promoter disclaimed receiving compensation, in the article, when, in fact, he received discounted BioZone common stock. Writing under a fictitious name, O'Rourke wrote a favorable and materially misleading article about MabVax acting in concert with Frost, Honig and other members of the undisclosed control group during the MabVax pump and dump scheme. The promoter did not disclose that the articles were paid for and not independently created, in violation §17(b) of the Securities Act.

58.     Frost continually bought OPKO stock in the open market notwithstanding his knowledge of the fraudulent practices.  Frost knew that his open market purchases would be reported on SEC Form 4 and that the financial press regularly report such purchases.  Frost knew or should have known that his reputation as a successful biotech investor combined with these open market purchases would lead to public investors purchasing OPKO stock.  In contrast, Frost concealed from public investors his untrue statements, his omissions of material fact in SEC filings, press releases, at investor conferences and the "pump and dump" schemes.

59.     Frost and OPKO omitted material facts, made untrue statements, made false filings with the SEC, engaged in a fraud on the market scheme, participated in schemes to defraud and engaged in a  course of business which operated as a fraud or deceit upon Robbins and other unsuspecting investors.

**B.** **The Second Claim for Relief Against Frost is for Violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a)**

60.     Plaintiff repeats and re-alleges paragraphs one (1) thru fifty-nine (59) as if set forth herein.

61.     As Chairman, CEO, Director and the largest shareholder of OPKO, Frost was the "controlling person" of OPKO within the meaning of §20(a) of the Exchange Act.  By reason of his position of control and authority as the highest ranking officer of OPKO, Frost had the power and authority to direct the management and activities of OPKO and its employees and to cause OPKO to engage in the wrongful conduct alleged in this Complaint.  Frost was able to and did control, directly and indirectly, the content of the public statements made by OPKO, during the relevant period thereby causing the dissemination of the false and misleading statements and omissions of material fact as alleged in this Complaint.

62.     Frost is also liable under §20(a) of the Exchange Act as the controlling person of OPKO, since OPKO is liable under §10(b) and Rule 10b-5 of the Exchange Act.

**C.** **Based on Pendant Jurisdiction, the Third Claim for Relief Against Frost and OPKO is for Violations of §§517.301  Fla. Stat.**

63.     Plaintiff repeats and re-alleges paragraphs one (1) thru sixty-two (62) as if set forth herein.

64.     Frost and OPKO, individually and acting-in-concert, directly and indirectly, omitted material facts, made untrue statements, made false filings with the SEC, employed a fraud on the market scheme, participated in schemes to defraud and engaged in a course of business which operated as a fraud or deceit upon Robbins and other unsuspecting OPKO investors by:

a.      deceiving the investing public, including Robbins regarding, among other things, Frost's connections to serial stock promoters Honig and Brauser and Frost's history of questionable penny stock investments, OPKO'S investments in BioZone, Cocrystal, and MabVax, OPKO's investment strategy, Frost's investing expertise and his good reputation as an investor, together with Frost's and FGIT's untrue statements that they were passive investors in MabVax;

b.      artificially inflate and maintain the market price of OPKO common stock; and

c.      induced Robbins and others to purchase OPKO common stock at artificially inflated prices and suffer losses when the true facts became known.

65.    Frost and OPKO violated §517.301 Fla. Stat. by committing the fraudulent practices described in ¶64.  Frost and OPKO are jointly and severally liable for their commission of the prohibited acts.

**D.     The Fourth Claim for Relief is Breach of Fiduciary Duty**

66.    Plaintiff repeats and re-alleges paragraphs one (1) thru sixty-five (65) as if set forth herein.

67.    Frost was the Chief Executive Officer, a Director and Controlling Person of OPKO. Therefore, Frost had a continuing duty of loyalty and due care to OPKO shareholders, including Robbins.  As such, Frost had a duty to disclose all material facts to OPKO shareholders and to abstain from any conflicts of interest, which he did not do.

68.    Frost breached his fiduciary duty to OPKO shareholders, including Robbins by putting his financial interests ahead of OPKO shareholders, omitting material facts, making untrue statements, made false filings with the SEC, employing a fraud on the market scheme, participating in schemes to defraud and engaging in a course of business which operated

as a fraud or deceit upon unsuspecting OPKO shareholders, including Robbins.

69.     The proximate cause of Robbins' losses were Frost's fraudulent practices described in

¶67 above which establishes his breach of fiduciary duty.

**E.      The Fifth Claim for Relief is Punitive Damages**

70.     Plaintiff repeats and re-alleges paragraphs one (1) thru sixty-nine (69) as if set forth

herein.

71.     Subject to this Court's future hearing determination on punitive damages, Frost's breach

of his fiduciary duty to OPKO shareholders, including Robbins, establishes that Frost is

liable to Robbins for punitive damages.

72.     Frost's intentional misconduct was a breach of fiduciary duty which warrants punitive

damages, according to §768.72 Fla. Stat.  As the OPKO controlling person, Frost had

actual knowledge of the wrongfulness of his conduct and the high probability that injury

or damage to Plaintiff would result.  Despite that knowledge, Frost intentionally pursued

that course of conduct resulting in damages to OPKO shareholders, including Robbins.

73.     Frost knowingly omitted material facts from OPKO's SEC filings, including Frost's

participation in a pump and dump scheme.  Frost also made untrue statements *ie.* Frost

and OPKO stated OPKO would make research and development investments in BioZone

and MabVax, but did not do so.

74.     In addition, Frost knowingly made an untrue statement in his Schedule 13G, instead of

filing the required Schedule 13D.  Frost also did not file a Current Report, in October

2013, on Form 8K, concealing his participation in the undisclosed control group.  The

required 8K information would have disclosed to the OPKO shareholders and the SEC

that Frost was participating in a pump and dump scheme.

75.     Frost's intentional breach of fiduciary duty establishes the need for punishment and deterrence.  Based on the foregoing, Robbins requests punitive damages equal to three (3) times the compensatory damages.

## XI.  The Relief Sought

76.     Based on the foregoing (¶s 1-75), Plaintiff requests joint and several liability for rescissionary damages in the amount of approximately $8,575,000  plus interest, litigation costs, filing fees, attorney's fees (pursuant to §517.211(6) Fla. Stat.), and punitive damages in an amount consistent with the Florida punitive damage statutes, §§768.72 & 768.73 Fla. Stat., and for such other and further relief as is fair and equitable.

## XII.  Jury Demand

77.     Plaintiff demands a Trial by Jury.

Dated: August 31, 2020

Mark A. Tepper, P.A.
Lead Counsel for Plaintiff

by **Mark A. Tepper, Esq.**
3107 Stirling Road
Suite 308
Fort Lauderdale, FL 33312
Tel. 954 961 0096
Fax: 954 961 0990
email: mark@marktepper.com

/s/   Norman B. Arnoff
**Norman B. Arnoff, Esq.**
Co-counsel for Plaintiff
2651 So. Course Drive
Pompano Beach, FL 33069
Tel. 917 912 1165
email: nbarnoff@aol.com

/s/ James L. Rothenberg
**James L. Rothenberg, Esq.**
Co-counsel for Plaintiff
*Pro hac vice* – pending
6 Brianna Road
Holland, PA.  18966
Tel. 215 579 2370
email: jamesrothenberg@msn.com

**Certificate of Service**

I hereby certify that on August 31, 2020 a true and correct copy of the foregoing was served via the CM/ECF system on the Clerk of the Court.

Mark A. Tepper, Esq.

**EXHIBIT 1**

SANJAY WADHWA
SENIOR ASSOCIATE REGIONAL DIRECTOR
Michael Paley
Charu Chandrasekhar
Nancy Brown
Katherine Bromberg
Jon Daniels
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ x
SECURITIES AND EXCHANGE COMMISSION,          :
                                             :
                    Plaintiff,               :
                                             :        18 Civ. _____ (  )
          -- against --                      :
                                             :        ECF CASE
BARRY C. HONIG, JOHN STETSON,                :
MICHAEL BRAUSER, JOHN R. O'ROURKE III,       :
MARK GROUSSMAN, PHILLIP FROST,               :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER,      :        COMPLAINT
JOHN H. FORD, ALPHA CAPITAL ANSTALT, ATG     :        AND JURY DEMAND
CAPITAL LLC, FROST GAMMA INVESTMENTS         :
TRUST, GRQ CONSULTANTS, INC.,                :
HS CONTRARIAN INVESTMENTS, LLC,              :
GRANDER HOLDINGS, INC., MELECHDAVID,         :
INC., OPKO HEALTH, INC.,                     :
SOUTHERN BIOTECH, INC., and                  :
STETSON CAPITAL INVESTMENTS INC.,            :
                                             :
                    Defendants.              :
------------------------------------------------------------ x
```

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Barry C. Honig ("Honig"), John Stetson ("Stetson"), Michael Brauser ("Brauser"),

John R. O'Rourke III ("O'Rourke"), Mark Groussman ("Groussman"), Phillip Frost ("Frost"),

Robert Ladd ("Ladd"), Elliot Maza ("Maza"), Brian Keller ("Keller"), John H. Ford ("Ford"),

Alpha Capital Anstalt ("Alpha"), ATG Capital LLC ("ATG"), Frost Gamma Investments Trust ("FGIT"), GRQ Consultants, Inc. ("GRQ"), HS Contrarian Investments, LLC ("HSCI"), Grander Holdings, Inc. ("Grander"), Melechdavid, Inc. ("Melechdavid"), OPKO Health, Inc. ("Opko"), Southern Biotech, Inc. ("Southern Biotech"), and Stetson Capital Investments Inc. ("SCI") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This case involves three highly profitable "pump-and-dump" schemes perpetrated by Honig, Stetson, Brauser, O'Rourke, Groussman, and Frost, and their entities GRQ, SCI, Grander, HSCI, Melechdavid, ATG, Opko, FGIT, and Southern Biotech from 2013 through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares.

2.      Across all three schemes, Honig was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity.  In each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company.  In every scheme, Honig, and some combination of Stetson, Brauser, O'Rourke, Groussman and Frost, either explicitly or tacitly agreed to buy, hold or sell their shares in coordination with one another, knowing that a pump and dump was in the offing that would allow them all to profit handsomely.  Once Honig and his associates had secured substantial ownership of the issuer, they acted as an undisclosed control group, directing the issuer's management for their benefit, including orchestrating transactions designed to create market

interest in the company or to solidify their control.

3.	To profit from their investment, in each scheme, Honig and his associates would arrange and pay for the promotion of the stock, directing their co-defendant Ford, or a similar promoter, to write favorable and materially misleading articles about the company whose stock price they wanted to inflate.  In several instances, to magnify the intended boost to volume and price that would follow a promotional article's release, Honig, Brauser, O'Rourke, Groussman, Melechdavid and ATG engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock, priming investor interest.

4.	In connection with the Company B and Company C schemes, Honig, Brauser, Stetson, O'Rourke, Frost and Groussman, as well as certain of their entities, also violated beneficial ownership reporting requirements of the federal securities laws by failing to disclose their group beneficial ownership of shares and the fact that as a group they were looking to exercise (and, in fact, did exercise) control over the issuers.

5.	Management of both Company A and Company B acted to further the schemes.  Defendants Maza (Company A's CEO), Keller (Company A's Chief Scientific Officer and a Director) and Ladd (Company B's CEO), acted separately at the direction of Honig and his confederates to take steps beneficial to that group at the expense of each company's public shareholders, and signed public filings they knew to be false to hide the group's beneficial ownership and existence.

6.	Maza and Keller signed Company A's public filings, in which they knowingly or recklessly omitted to disclose the share ownership as a group of Honig, Brauser, Frost, Stetson, and Groussman, or the size of each of their holdings.  Similarly, Company B's CEO, Ladd, also signed false public filings, making material misstatements in them about the

substantial group ownership of Company B shares held by Honig, Brauser, Stetson, O'Rourke, and Groussman.

7.      All told, the three schemes brought Defendants millions of dollars:  Company A's pump and dump generated for the Defendants more than $9.25 million in stock sales proceeds, and Company B's pump and dump generated more than $9.5 million.  And their most recent venture, the pump and dump scheme with respect to Company C, brought in over $8.3 million in stock sales proceeds.  In the wake of these schemes, public investors were left holding virtually worthless stock.

## VIOLATIONS

8.      By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws as follows:

9.      Honig violated:

- Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (2) of the Securities Exchange Act of 1934 ("Exchange Act") [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

10.      Stetson violated:

4

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

11.     Brauser violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 9(a)(1) of the Exchange Act [15.U.S.C. § 78i(a)(1)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

12.     O'Rourke violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

13.     Groussman violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

14.     Frost violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

15.     Ladd violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] and by aiding and abetting Company B's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1].

16.     Maza violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

17.     Keller violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

18.     Ford violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]; and

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

19.     Alpha violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

20.     ATG violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Sections 9(a)(1) and (2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

21.     GRQ violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

22.     HSCI violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

23.     Grander violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

24.     Melechdavid violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 9(a)(1) of the Exchange Act [15.U.S.C. § 78i(a)(1)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

25.     Opko violated:

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

26.     FGIT violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

27.     Southern Biotech violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

28.     SCI violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

29.     The Commission seeks final judgments permanently enjoining Defendants from violating the federal securities laws, requiring each Defendant to disgorge his or its ill-gotten gains and to pay prejudgment interest on those amounts; requiring Defendants to pay civil

monetary penalties; barring Defendants from participating in future penny stock offerings; barring Defendants Ladd, Maza, and Keller from serving as officers or directors of publicly traded companies; and seeking any other relief that the Court deems just and appropriate.

30. Unless Defendants are permanently restrained and enjoined, they each will again engage in the acts, practices, and courses of business set forth in this Complaint, or in acts and transactions of similar type and object.

## JURISDICTION AND VENUE

31. The Commission brings this action pursuant to the authority conferred by Sections 20(b) and (d) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)], and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

32. This Court has jurisdiction over this action pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and 77v(c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

33. Venue lies in this district pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and (c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York. Among other things, at all relevant times, Company B's principal place of business was in Harrison, New York, within this District, and Defendants solicited investments in securities from investors in this District and sold securities through a broker-dealer located in this District.

## THE DEFENDANTS

### Individual Defendants

34.     **Honig**, born in 1971, is a resident of Boca Raton, Florida and currently works at an office in Boca Raton with Stetson and O'Rourke, and at times, Groussman.  Honig owns GRQ, and co-owns, with Stetson, HSCI, and co-owns, with Brauser and Frost, Southern Biotech.

35.     **Stetson**, born in 1985, is a resident of Fort Lauderdale, Florida and currently works at an office there with Honig and O'Rourke, and at times, Groussman.  Stetson owns SCI, and co-owns, with Honig, HSCI, of which he is the managing member.

36.     **O'Rourke,** born in 1985, is a resident of Fort Lauderdale, Florida and currently works at an office in Boca Raton with Honig and Stetson, and at times, Groussman.  O'Rourke owns ATG.

37.     **Brauser**, born in 1956, is a resident of Lighthouse Point, Florida and currently works in an office in Miami in the same building as Frost.  Brauser owns Grander.

38.     **Groussman**, born in 1973, is a resident of Miami Beach, Florida and occasionally works at an office in Boca Raton with Honig, Stetson and O'Rourke.  Groussman owns Melechdavid.

39.     **Frost**, born in 1936, is a resident of Miami Beach, Florida.  Frost founded Opko, and is its CEO.  Frost is also the trustee for FGIT.  Frost enjoys a reputation as a successful biotech investor.

40.     **Maza**, born in 1955, is a resident of New York, New York.  He was the CEO of Company A from June 2011 to January 2014.  He is a CPA licensed in New York, as well as an attorney licensed in New York.

41.     **Keller**, born in 1956, is a resident of California.  He was Chief Scientific Officer of Company A from about March 2011 to January 2014, and was a member of its board

13

of directors. He currently works as President of Sales and Senior Vice President of Research and Development at Company A's successor company.

42.     **Ladd**, born in 1959, is a resident of Raleigh, North Carolina. At all relevant times, he was a resident of New York, New York. He has been the CEO of Company B since February 10, 2011.

43.     **Ford**, born in 1956, is a resident of Bolinas, California.

**Entity Defendants**

44.     **Alpha** is a Lichtenstein corporation and hedge fund, managed by an unregistered investment adviser located in New York, New York.

45.     **ATG** is a Florida corporation that O'Rourke owns and operates with its principal place of business in Florida. ATG was incorporated in or around 2012.

46.     **FGIT** is a Florida trust that was formed in or around 2002. Frost is FGIT's Trustee.

47.     **GRQ** is a Florida corporation that Honig owns and operates with its principal place of business in Florida. GRQ was incorporated in or around 2004.

48.     **Grander** is a Florida corporation that Brauser owns and operates with its principal place of business in Florida. Grander was incorporated in or around 2010.

49.     **HSCI** is a Delaware corporation that Honig and Stetson co-own and of which Stetson is the managing member, with its principal place of business in Florida. HSCI was established in or around 2011.

50.     **Melechdavid** is a Florida corporation that Groussman owns and operates with its principal place of business in Florida. Melechdavid was incorporated in or around 2006.

51.     **Opko** is a Delaware corporation. Its principal place of business is in Florida.

Frost is Opko's CEO. Opko was incorporated in or around 2007.

52.     **Southern Biotech** is a Nevada corporation that Honig operates and co-owns with Brauser and Frost with its principal place of business in Florida. Southern Biotech was incorporated in or around 2014.

53.     **SCI** is a Florida corporation that Stetson owns and operates with its principal place of business in Florida. SCI was incorporated in or around 2011.

## OTHER RELEVANT PERSONS AND ENTITIES

54.     **Company A** is a Delaware corporation headquartered in Georgia. Company A was controlled by Honig, Frost, and Brauser between March 2011 and December 2013. It was incorporated in Nevada in 2006. The company filed periodic reports, including Forms 10-K and 10-Q with the Commission. Company A's stock was quoted on OTC Link (formerly known as the "Pink Sheets"), an electronic interdealer quotation system operated by OTC Markets Group, Inc. In early 2014, Company A engaged in a reverse merger with a company associated with Honig and his associates. The successor company is currently quoted on OTC Link. At all relevant times, Company A's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)], and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

55.     **Company B** is a Delaware corporation headquartered in Harrison, New York. Its common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it files periodic reports, including Forms 10-K and 10-Q with the Commission. Company B's common stock was listed on NYSE MKT from 2007 until its October 19, 2016 delisting. Its stock is currently quoted on OTC Link. At all relevant times, Company B's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

15

56.     **Company C** is a Delaware corporation headquartered in San Diego, California, and was incorporated in 1988. Company C's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and its common stock is listed on NASDAQ. At all relevant times, Company C's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

## FACTS

### A.  The Company A Scheme

#### 1.     *Honig, Frost and Brauser Obtain Control of Company A*

57.     In the Company A scheme, Honig and Brauser teamed up with Frost, a frequent collaborator in Honig and Brauser deals involving biotech issuers. As alleged below, the three men caused the company to issue shares to themselves and their associates through a series of so-called "private investments in public equities," or "PIPE" financings, drove the price of the stock higher by secretly paying for a misleading promotional campaign and by virtue of Honig's and Brauser's manipulative trading, and then unlawfully sold their Company A shares into the inflated market for proceeds of approximately $9,260,000.

58.     In November 2010, Honig, along with his nominees including Stetson and Groussman, purchased one-third of a publicly-traded shell company. In December 2010, Brauser and Frost each purchased one-half of the remaining two-thirds of the publicly-traded shell company. Each of Honig, Stetson, Groussman, Brauser, and Frost, disguised their role in the acquisition by purchasing the shares from an entity used to make the purchase of the shell company. Soon after they acquired the shell, Honig, Brauser, and Frost installed a Frost associate as the sole disclosed director of the company.

59.     In late 2010, Honig, Brauser, and Frost approached management of a private

16

biotech company ("Company A Labs"), including Keller, the Chief Scientific Officer and
Director, and Company A Labs then-CEO ("Company A Labs CEO") with a proposal for taking
the company public. Honig, Brauser, and Frost proposed a reverse merger, by which Company
A Labs, a privately-held California company then in the business of manufacturing over-the-
counter pharmaceutical products, would be merged into Honig's, Brauser's, and Frost's publicly-
traded shell. At the time, Company A Labs and Keller were working on developing a
formulation using a patented technology called "Qusomes" that Company A Labs hoped to use
in large-scale drug markets, and the management of Company A Labs saw the deal as creating
financing possibilities to fund the company's research.

60.     Indeed, Honig, Brauser, and Frost told Keller and Company A Labs CEO that
the public company deal would include raising $8 to $15 million dollars to support research and
development ("R&D") into Qusomes. And they further persuaded Company A Labs CEO to go
along with the merger by promising him 6,650,000 shares of the newly created public company.

61.     The proposed merger hit a snag, however, in March 2011. Pursuant to a $3
million credit line Company A Labs had with a San Francisco bank, the bank had authority to
approve all major transactions, and, in March 2011, it declined to approve the proposed merger.
The merger nonetheless closed in June 2011, and the bank thereafter sent a default notice. On
September 8, 2011, Maza, who had been installed as the CFO and director of Company A Labs
by Honig and Brauser, completed the payoff of the credit line thereby removing the obstacle to
the merger, but saddling Company A Labs with short-term, high-interest rate notes that included
a conversion option into equity of the company.

62.     In connection with the reverse merger, Honig, Brauser, and Frost arranged the
sale of certain unprofitable Frost assets to the public company in exchange for 8,345,310 shares

17

and the obligation of the company to file a registration statement for these shares, providing further value to Frost.

63.     After the closing of the reverse merger of Company A Labs into the shell company in June 2011, the surviving public company became Company A. Honig, Brauser, Frost, Groussman, and Stetson controlled the vast majority of the Company A's stock and were affiliates of Company A.

64.     After the merger, Company A listed its corporate address at 4400 Biscayne Boulevard in Miami, the same business address then shared by Honig, Brauser and Frost.

65.     In addition to controlling the vast majority of Company A's outstanding shares, Honig, Brauser, and Frost exercised control over the management of Company A. Before the deal closed, Honig and Brauser, acting with the knowledge and consent of Frost, Stetson and Groussman, had installed their associate, Maza, as the CFO and a director of Company A Labs. After the merger, Maza became the CEO of Company A. Thereafter, Maza sought approval from Honig and Brauser for every business decision. For example, at the direction of Honig and Brauser, Maza agreed to divert funds from Company A to pay rent for the office of an unrelated entity co-owned by Honig and Brauser.

66.     In their capacity as the three board members of Company A, Keller, Maza, and the Frost associate concealed Honig's and Brauser's control of Company A by signing off on public filings that failed to disclose the involvement of Honig, Brauser, Stetson and Groussman, omissions that made those filings materially misleading. These filings included Company A's Form 10-K filed on April 16, 2012.

67.     At the time they signed these filings, Keller and Maza understood that Honig and Brauser, with Frost's knowledge and consent, controlled Company A's management, and not

Maza. As Keller explained in a February 12, 2012 email to a Company A colleague, "[t]he real power is with Barry Honig and Mike Brauser. Elliot [Maza] is just a mouth piece." Following the merger, Company A's filings nonetheless identified only Frost, but not Honig or Brauser, as a control person.

68.     Honig, Brauser, and Frost failed to keep their promises to invest money in Company A for R&D. Instead, in a series of PIPE financings, which included warrants for additional shares, done between February 24 and March 12, 2012, they limited their investment to keep the business operating at a minimal level and to fund Maza's and Keller's generous compensation, forcing Company A to abandon its R&D efforts entirely by mid-2012. Keller's compensation more than doubled once he began working with Honig and Honig's associates, whereas Maza's annual compensation ranged from $300,000 to $600,000.

69.     Honig, Brauser, and Frost also used the financings to amass more, ever-cheaper Company A shares, and although the financings did nothing to enhance Company A's continued growth, Maza and Keller went along with them because both were promised, and ultimately awarded, substantial salaries as well as millions of Company A shares, by Company A's real control persons, which included Honig, Brauser, Frost, Stetson and Groussman.

70.     By April 1, 2013, and pursuant to an agreement to acquire, hold or sell their shares in concert, Honig, Frost, Brauser, Maza, Keller, and the Frost associate had amassed 44,818,312 shares, or almost 71% of the Company A shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares. Yet, even though Company A filed an amendment to its Form 10-K annual report for the 2012 fiscal year on September 13, 2013, signed by Maza, Keller, and the third board member, for the specific purpose of updating the beneficial ownership table, the annual report failed to disclose the

existence of the Honig-allied group, which beneficially owned nearly three-quarters of Company A's outstanding shares.

71.     On July 16, 2012, Company A Labs CEO – who had been ousted from Company A by Honig and Brauser with Keller's assistance – sued Company A, Honig, Brauser, Maza, and Frost. Brauser, who was not an officer or director of Company A, took the lead in negotiating a settlement on behalf of Company A, frequently updating Honig and Frost on his negotiations. In September 2013, Brauser and Honig came to terms with Company A Labs CEO, agreeing to pay him $2 million in return for his relinquishing his claim to the Company A shares he had been promised in the merger, and that he had never received. Maza then ratified the settlement terms on September 5, 2013.

### 2.     *The Company A Pump and Dump*

72.     In preparation for the Company A pump and dump, during August and September, 2013, Stetson, at Honig's direction, deposited in a brokerage account almost 4 million Company A shares that had been issued to Honig. Stetson worked closely with Honig, Brauser, and Frost and knew how much Company A stock they controlled, and that Honig and Brauser were directing Company A's management and policies. In connection with the deposit of these shares, Stetson submitted Honig's signed answers to the broker's questionnaire, falsely denying any relationship between Honig and Company A or its affiliates. At the time that Stetson made that submission, and Honig signed it, each knew, or was reckless in not knowing, that Honig was an affiliate of Company A because Company A was under Honig's control.

73.     On September 4, 2013, Stetson facilitated the issuance of false attorney opinion letters to Company A's transfer agent in order to remove restrictive legends from Honig's share certificates. These opinion letters contained the material misrepresentation that Honig was not

an affiliate of Company A, a representation that Stetson knew, or was reckless in not knowing, was false, given what he knew about Honig's control over Company A's management and polices.

74.     As part of the process for depositing Honig's shares with a broker, and in preparation for the pump and dump, CEO Maza was also required to issue a letter to confirm the authenticity of the stock certificates. In a letter to the broker-dealer, dated September 10, 2013, Maza wrote "[w]e further acknowledge and agree that there is no other agreement or understanding between Barry Honig and [Company A] that would preclude Barry Honig from selling or otherwise disposing of shares represented above." Maza knew, or was reckless in not knowing, that this statement was false because Honig was an affiliate of Company A, and that, as an affiliate, Honig's ability to sell his Company A shares would be subject, under the federal securities laws, to volume limitations.

75.     Once the restrictions were lifted from Honig's shares and the shares were deposited into a brokerage account, Honig was ready to sell them. In September 2013, Honig directed his associate, O'Rourke, to reach out to Ford, a seasoned stock promoter who used his platform on the *Seeking Alpha* website to share his purportedly independent investment analysis of selected companies. O'Rourke contacted Ford and proposed that Ford write an article on the *Seeking Alpha* website promoting Company A in exchange for below-market price Company A shares. At that time, Honig, Frost, Brauser, Stetson, Groussman, O'Rourke, Keller, Maza, and the Frost associate board member owned about 71% of the outstanding Company A shares, and the market for Company A was virtually nonexistent (with zero volume on September 20, 2013). O'Rourke instructed Ford to write a favorable article about Company A emphasizing Frost's involvement (because Frost was known as a billionaire and successful biotech investor) and the

supposed rosy prospects of Company A's R&D.

76.     On September 23, 2013, Honig and some associates began trading Company A shares to create the appearance of market activity and interest in Company A in advance of the planned Ford article. That day, the trading volume of Company A shares soared to 302,000 from zero volume the previous day.

77.     The September 23rd trading also gave Honig a way to surreptitiously pay Ford for his upcoming favorable article on Company A. O'Rourke called Ford and told him to put in buy orders for Company A stock at $0.40 in order to ensure his order was executed against the corresponding sell order placed by Honig. Honig then sold 180,000 Company A shares to Ford at $0.40 in a coordinated trade, a price well below the price at which these shares otherwise traded during that day.

78.     O'Rourke joined the trading at the end of the trading day on September 23rd to "mark the close," *i.e.*, to ensure that the last price of the day would be higher, giving the false impression that Company A's share price was on an upward trajectory. Specifically, at 3:58 pm that day, O'Rourke, through his entity ATG, placed a bid to buy Company A shares at $0.68, a significantly higher price than the prior buy order at $0.55, which had been entered at about 3:06 pm. Another Honig associate, who had purchased shares from Honig earlier in the day, placed a corresponding sell order to complete the transaction at the inflated price.

79.     In further preparation for the publication of the Ford article touting Company A, and to enhance the false picture of an active market for the stock, near the end of the trading day on September 26th, Honig and his associates engaged in a series of coordinated trades. For example, the Barry & Renee Honig Charitable Foundation, controlled by Honig, sold Company A shares to a Honig associate at $0.68, and two minutes later Groussman's entity Melechdavid

executed a transaction against ATG, O'Rourke's entity, at $0.68.

80.     Less than half an hour before market close on September 26, 2013, as directed by O'Rourke and Honig, and after review by Keller, Ford published a materially misleading promotional article on *Seeking Alpha*, titled "Opko and Its Billionaire CEO Invested in Company A." Ford presented a bullish outlook for Company A and concluded that "Company A should be trading for more than twice today's valuation." In the article, which included a question and answer interview of Keller, Ford quoted Keller touting the benefits of Company A's Qusomes technology. Keller misleadingly stated that Company A had a formulation ready for testing to be brought to the billion-dollar injectable drug market. Yet, as Keller knew, as of summer 2012, all R&D efforts had been shut down without the successful formulation of an injectable drug and Company A had ceased all efforts to develop this technology in mid-2012.

81.     Ford's article failed to disclose that he had been compensated by Honig for writing the article, through Honig's sale to him of below-market Company A shares on September 23, a material omission. Instead, Ford included a disclaimer that merely disclosed "I am long [Company A]. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article." (Emphasis added.)

82.     The market reacted strongly to the Company A promotion: the trading volume of Company A stock rose from approximately 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013 and to more than 6 million shares on October 2, 2013. The share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013.

83.     Between the start of the promotion following the publication of Ford's article

23

on September 26, 2013 and December 31, 2013, Honig and his associates sold shares into the inflated market for proceeds of approximately $9,260,000:

| Company A Pump and Dump Proceeds | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2013)** | **Net Quantity Sold** | **Proceeds** |
| **Honig** | 9/23 – 12/16 | (5,892,689) | $3,416,455.17 |
| **Brauser** and **Grander** | 9/27 – 12/23 | (2,128,316) | $1,137,775.46 |
| **Frost** | 10/1 – 10/4 | (1,987,991) | $1,085,321.74 |
| **Groussman** and **Melechdavid** | 9/26 – 10/14 | (1,229,166) | $677,272.37 |
| **Stetson** and **SCI** | 9/27 – 12/18 | (500,000) | $279,859.68 |
| **O'Rourke** and **ATG** | 9/23 – 12/27 | (250,000) | $148,443.68 |
| **Alpha Capital** | 10/3 – 11/27 | (3,772,200) | $2,513,724.08 |
| **Total** | | **(15,760,362)** | **$9,258,852.18** |

84.     No registration statement was then in effect for any of Honig's, Brauser's, Frost's or Groussman's sales in the September through December 2013 period. No exemption from registration was available to any of them, or their entities. Moreover, since Company A did not trade on a national securities exchange, as affiliates of Company A, these Defendants could only lawfully sell 1% of the company's total shares outstanding in any three-month period. As of September 2013, Company A had approximately 63 million shares outstanding, and as of November 15, 2013, it had approximately 75 million shares outstanding. Because Honig, Brauser, Frost, and Groussman, and their respective entities, were under common control with Company A, each was an affiliate of Company A, and each sold shares in excess of the applicable volume limitations.

### 3.     *Alpha's Company A Sales*

85.     Alpha frequently co-invested with Honig, and participated in several rounds of the Company A PIPE financings, resulting in Company A's issuance of millions of shares to Alpha at steeply discounted prices in January 2012, April 2013 and September 2013.

86.     On September 5, 2013, when Honig and Brauser reached their settlement with

Company A's CEO, by which he disavowed his ownership of the 6,650,000 shares to which he had been entitled, Alpha purchased 1.5 million of those shares at $0.15 per share, with the intention of selling the shares into the inflated market created by the Honig-orchestrated promotion. Company A issued the shares to Alpha on September 23, 2013, days before the Ford article appeared on *Seeking Alpha*. On October 29, 2013, Alpha obtained an attorney opinion letter that it supplied to Company A's transfer agent so that the transfer agent would remove the restrictive legend from the share certificate. The attorney opinion letter – as Alpha knew or was reckless in not knowing – falsely represented that Alpha had held the shares for at least 6 months and that the shares could be sold in accordance with the Securities Act Rule 144 safe harbor, as exempt from the registration provisions.

87.     Between October 3, 2013 and November 18, 2013, Alpha, in lockstep with Honig, Brauser, Frost, Groussman, O'Rourke, and Stetson (and their respective entities), sold 3.7 million Company A shares for proceeds of $2,513,724, including virtually all of the shares Alpha had obtained in September 2013.

## B. The Company B Scheme

### 1. *Honig and Associates Secretly Obtain Company B Shares*

88.     During 2015 and 2016, Honig and his associates used Company B, a publicly traded shell, as another vehicle for a pump-and-dump scheme. Honig and his partners used many of the same tactics they had employed in the Company A scheme: they bought cheap shares, intending to exercise control over the management and polices of the company; exercised that control; orchestrated a misleading promotion of the company that drove up the stock price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market. Despite their control over various actions taken by Company B, and their agreement to buy, hold and/or sell their shares in concert, Honig and his associates – this time

including Groussman, Brauser, Stetson and O'Rourke – took numerous steps to conceal their involvement, and to perpetuate the false appearance that the company was actually being controlled by its CEO.

89.     In 2015, Honig and his associates began planning the pump-and-dump of Company B's shares. Honig set the scheme in motion on September 26, 2015 when he informed Stetson that "[w]e need to put together a term sheet for Company B," and outlined proposed terms of the arrangement. Honig directed Stetson to send the proposal to Ladd, Company B's CEO. The deal contemplated the issuance of 2.8 million Company B shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings. By ostensibly staying below the 5% ownership threshold, and evading the public reporting requirements, Honig and his associates increased the likelihood that they could disguise their scheme to pump up the price of Company B's shares in anticipation of a profitable sell-off to unsuspecting investors.

90.     Ladd was fully aware of Honig and his associates' combined interest in, and control over, the company, but failed to disclose it in Company B's public filings. On October 1, 2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ." Honig replied that same day, copying Brauser and Stetson, that he would "get back to you with names shortly for now use Barry Honig Mike Brauser OBAN [an LLC created by Stetson]." On October 5, 2015, Stetson provided Company B with the investors who would participate in the financing, which included GRQ (Honig), Melechdavid (Groussman), Grander (Brauser), ATG (O'Rourke) and SCI (Stetson).

91.     The Honig-led financing ultimately provided $700,000 to Company B (the "October 2015 Company B Financing"). On October 8, 2015, Company B filed a Form 8-K disclosing that the company had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units . . ." In keeping with Honig's desire to conceal the large ownership stake of his team, Ladd did not disclose the investors' names in the Form 8-K.

### 2.     *The Company B Pump and Dump in February 2016*

92.     Having coordinated the accumulation of stock with Groussman, Brauser, Stetson and O'Rourke, Honig, with his partners' knowledge and consent, then secretly paid for a promotion that included materially misleading information and was supported by his own manipulative trading activity.

93.     On or around January 21, 2016, by which time Honig, Groussman, Brauser, Stetson and O'Rourke had acquired at least 16.3% of Company B's outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of Company B. Shortly after the payment for the stock promotion, on February 3, 2016, an article was published online touting Company B's positive prospects in social and real money gaming sites and intellectual property relating to slot machines. The article did not disclose that the author had been paid by Company B – at Honig's direction – to write the article. After the article was published on February 3, 2016, there was a 7000% increase from the previous day's trading volume, and an intraday price increase of over 60%. Honig, Ladd, Stetson, and O'Rourke sold over 430,000 shares into this inflated market for proceeds of approximately $198,800.

| Company B Pump and Dump Proceeds, Following February 2016 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2016) | Net Quantity Sold | Proceeds |
| **Honig** and **GRQ** | 2/3 – 4/6 | (231,050) | $123,154.87 |
| Stetson | 2/3 – 2/11 | (40,000) | $20,483.33 |
| **O'Rourke** and **ATG** | 2/3 – 2/9 | (64,366) | $15,960.72 |
| Ladd | 2/3 – 5/3 | (96,072) | $39,204.12 |
| Total | | **(431,488)** | **$198,803.04** |

### 3. The Company B Pump and Dump in May 2016

94. Honig soon identified a potential acquisition target for Company B that would give Honig and his associates another way to profit from their interest in Company B. The proposed deal involved a well-known cybersecurity innovator who had created a popular antivirus software bearing his name ("the Cybersecurity Innovator"). O'Rourke took the lead at Honig's direction (and with the knowledge and consent of Groussman, Brauser and Stetson) in arranging a deal between Company B and the Cybersecurity Innovator. On March 29, 2016, O'Rourke sent the Cybersecurity Innovator a term sheet for the asset purchase of Cybersecurity Innovator's company, "CI Company," by an "NYSE listed company." The CI Company indicated interest on April 3, 2016. O'Rourke wrote to Honig on April 3, 2016 and asked Honig if he would "still want to pursue [Cybersecurity Innovator] deal." After Honig replied to O'Rourke that same day "Yea!", O'Rourke introduced Ladd to the Cybersecurity Innovator on April 4, 2016, to begin negotiating a transaction between Company B and the Cybersecurity Innovator's various business interests.

95. Subsequent correspondence between Ladd and O'Rourke and between O'Rourke and Honig, reflect the ongoing and significant role Honig and O'Rourke played in orchestrating the deal. Company B and the Cybersecurity Innovator agreed to terms on May 8, 2016.

96. On May 9, 2016, at 8:30 a.m., Company B issued a press release announcing

its merger with CI Company. In the release, Ladd misleadingly described the Cybersecurity Innovator's prior financial success. He falsely claimed that the Cybersecurity Innovator had "sold his anti-virus company to Intel for $7.6 billion," suggesting that Company B might achieve similar success. Yet, as Ladd knew or was reckless in not knowing, the sale of the Cybersecurity Innovator's namesake company to Intel at that price had occurred over a decade after the Cybersecurity Innovator's departure from that company.

97. Knowing that Ladd's misleading announcement of the deal would be released later that morning, on May 9, 2016, Honig traded in Company B stock to create the misleading appearance of market liquidity. In pre-market trading that morning, Honig bought and sold small quantities of Company B stock dozens of times. Joining the effort to paint a false picture of legitimate market interest in the stock, Brauser, as well as Groussman, and his entity, Melechdavid, engaged in coordinated trades in Company B stock with Honig in pre-market trading that morning.

98. That same day, StockBeast.com, a well-known internet stock promotion website, published an article by an unnamed author entitled "[Company B] Beastmode engaged – [Cybersecurity Innovator] driving the Bus." The StockBeast.com article touted Company B and highlighted the Cybersecurity Innovator's involvement, repeating Ladd's materially false claim that the Cybersecurity Innovator had "sold his startup company to Intel for $7.6BB," and proclaiming: "This is big big big!"

99. This promotion and Honig's, Brauser's and Groussman's manipulative trading on May 9 were effective in driving up both volume and price: on May 6, 2016 (the last day of trading prior to the promotion), Company B had trading volume of 71,005 shares and a closing price of $0.36. On May 9, 2016, the stock closed at $0.49 (representing an increase of 34

percent over the prior day's close) with trading volume of more than 10 million shares. The trading volume for Company B stock peaked at 109,384,614 on May 17, 2016 with a closing price of $4.15.

100.    In the days immediately following the announcement of the CI Company acquisition, Honig, Brauser, Stetson, Groussman and O'Rourke, pursuant to their agreement to buy, hold and/or sell their shares in concert, sold over 9.3 million Company B shares, resulting in total proceeds of over $9.4 million:

| Company B Pump and Dump Proceeds, Following May 2016 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2016) | Net Quantity Sold | Proceeds |
| **Honig** and **GRQ** | 5/9 – 5/20 | (3,783,001) | $2,393,915.52 |
| **Brauser** and **Grander** | 5/9 – 5/18 | (2,137,668) | $3,839,295.64 |
| **Groussman** and **Melechdavid** | 5/9 – 5/11 | (1,415,870) | $999,873.56 |
| **Stetson** and **SCI** | 5/9 – 5/12 | (750,000) | $660,798.20 |
| **O'Rourke** and **ATG** | 5/9 – 5/16 | (750,000) | $990,661.97 |
| **Ladd** | 5/9 – 5/31 | (471,000) | $516,554.08 |
| **Total** | | **(9,307,539)** | **$9,401,098.97** |

### 4.    *False Statements by Honig, Frost, Brauser, Stetson, Groussman, O'Rourke, and Ladd in Beneficial Ownership and Company B Filings*

101.    Although they were acting in concert, and pursuant to an agreement to do so, Honig, Frost, Brauser, Stetson, Groussman and O'Rourke knowingly or recklessly concealed their concerted efforts from the investing public. Ladd, with full knowledge of both the Honig group's ownership and their direction of the management and policies of Company B, also kept their control a secret, signing Company B public filings that did not disclose the full extent of their ownership or control. After the October 2015 Company B Financing closed, Honig, Groussman, Brauser, Stetson and O'Rourke as a group collectively owned at least 2.6 million shares, or over 16% of the shares outstanding after the issuance, and their obligation to file a Schedule 13D under Exchange Act Section 13(d) arose as of October 8, 2015. Moreover, they

each had warrants to obtain a total of an additional 4.6 million Company B shares, which, if they were all converted, would have resulted in Honig, Groussman, Brauser, Stetson and O'Rourke controlling at least 42% of the total common shares outstanding at that time.

102.     Honig, Groussman, Brauser, Stetson and O'Rourke exercised control over Ladd and the management and policies of Company B.  For example, on October 1, 2015, Ladd asked for and received Honig's direction with respect to how to disclose Honig's group's stock acquisitions to the NYSE MKT exchange.  O'Rourke, at Honig's direction, negotiated on Company B's behalf the terms on which the Cybersecurity Innovator would sell CI Company to Company B.  Indeed, in emails after the CI Company acquisition, Honig freely accepted credit for his role in the transaction.  On May 12, 2016, for example, Honig received an email from an investment firm congratulating him on the recent transaction: "You're invovlved [sic] with [Company B]? Impressive!" Honig responded that he was the "[l]argest shareholder, fund and relationship with [the Cybersecurity Innovator]."  In early August 2016, Honig also admitted his undisclosed role at Company B in a chat conversation with Stetson: "its great in [Company B] because we are behind the scenes."

103.     Because they acted in concert for the purpose of acquiring, holding and disposing of Company B shares, each of Honig, Groussman, Brauser, Stetson and O'Rourke was a member of a group and considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of the group and disclosing the number of shares each of them beneficially owned.  However, none of Honig, Groussman, Brauser, Stetson or O'Rourke ever made a Schedule 13D filing disclosing their respective ownership or membership in a group, acting intentionally to conceal from the market the size of

31

their group's position and their coordination and thereby to deceive investors.

104.     Instead, on October 19, 2015, Honig filed a Schedule 13G, claiming only his own 6.59% beneficial ownership and falsely stating that the securities "are not held for the purpose of or with the effect of changing or influencing the control of the issuer" – a representation he knew, or was reckless in not knowing, to be false. Indeed, because Honig and his associates exercised control over Company B's management and policies – as Honig candidly acknowledged in emails – he was disqualified from making a 13G filing. In February 2016, Honig filed an amended Schedule 13G disclosing an ownership percentage of 9.1%. Brauser filed a Schedule 13G on May 4, 2016, in which he claimed 7.4 % beneficial ownership via his entity Grander. In each of these filings, Honig and Brauser also falsely claimed that they were passive investors without any intention to influence or change control of the company and omitted the fact that each was a member of a group.

105.     Similarly, in Company B's 2015 Form 10-K filed on April 11, 2016, only Honig was disclosed as a beneficial owner, holding 8.6%. Notwithstanding that Ladd knew that Honig, Groussman, Brauser, Stetson and O'Rourke were working together, he signed the 2015 Form 10-K failing to disclose their group beneficial ownership. Ladd also signed a materially misleading S-1/A registration statement filed on January 13, 2016 for the 8,400,000 Company B shares issued in the October 2015 Company B Financing, failing to disclose the group beneficial ownership of GRQ, Grander, Melechdavid, ATG and SCI.

### C. The Company C Scheme

#### 1.     *Honig and Stetson Obtain Control of Company C*

106.     In early 2014, Honig identified a publicly-traded shell company that was unencumbered by debt or pre-existing convertible debt, and sought an appropriate private company for purposes of a reverse merger and pump-and-dump scheme.

107.     At or about the same time, the CEO of Company C ("Company C's CEO") was introduced to "Entity H," a frequent co-investor alongside Honig and Brauser. At the time, Company C, a private company developing cancer therapies and diagnostic products, was looking for funding for its research and development efforts, and Entity H suggested to Company C's CEO that he turn Company C into a public company. On July 8, 2014, Company C executed a reverse merger of Company C into the shell company Honig had identified. Company C's CEO understood that the two lead investors in the transaction were Entity H and HSCI, both of which had signed the deal documents. Stetson had described HSCI to Company C's CEO as his own investment vehicle. In fact, while Stetson was the sole managing member of HSCI, Honig actually owned at least 94% of HSCI, a fact that Stetson did not disclose to Company C's CEO or the market.

108.     In an initial $3 million capital raise in February 2014, in connection with the contemplated merger, HSCI invested $1 million and Entity H invested $1.7 million in return for a substantial position in the shell. As a result, the stake of Entity H and HSCI (including conversion of all warrants) amounted to about 67% of the authorized shares of the newly public Company C. The terms of the merger included granting a "Consent Right" to Entity H and its affiliates, by which Entity H could block or approve many kinds of Company C transactions, including issuing additional shares, any change of control and other basic corporate actions.

109.     In March and April 2015, Honig orchestrated two private placement financings for Company C: Series D and Series E. Honig determined the amount, source and structure of, and participants in, these financings. For example, when deciding whether a potential investor could take part in the March 2015 financing round, Company C's CEO explicitly deferred to Honig, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might

33

want to allow to invest along with the current group. Viewed this as your choice not mine. That is why I asked him to call you."

110.     The Series D financing closed in late March 2015 and included a buyout of Entity H's notes, including the Consent Right, at a favorable purchase price. The investors who purchased the notes included various entities owned and controlled by Honig, Stetson, O'Rourke, Brauser, Frost, and Groussman: HSCI, Southern Biotech, GRQ, ATG, Grander, and Melechdavid.

111.     The Series E financing, which closed April 6, 2015, included warrants, and raised $12 million for Company C on terms highly favorable to Honig and his chosen investors, including Southern Biotech, and Frost's FGIT and Opko.

### 2.     *The Company C Pump and Dump in April 2015*

112.     One of the goals of the private placement financings, as Honig, Stetson, O'Rourke, Brauser, Frost, and Groussman knew, was to generate market interest in Company C stock in preparation for a planned stock promotion. On April 3, 2015, O'Rourke, acting at Honig's direction, drafted a press release (with input from Company C's CEO, Honig and Brauser) announcing the $12 million private placement in which Frost's entities had participated. Honig then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym "Wall Street Advisors" on *Seeking Alpha* on April 8, 2015 at 11:13 a.m. The article, titled "Opko Spots Another Overlooked Opportunity in Company C Therapeutics," highlighted Opko's and Frost's investment in Company C. Despite his involvement in facilitating the Company C financing and his extensive business relationships with Honig, Stetson, Brauser, and Frost, in his article, O'Rourke knowingly and falsely claimed that "[t]he author has no business relationship with [Company C]." He also knowingly and falsely claimed

that he was "not receiving compensation for [writing the article]."

113.     Anticipating the release of O'Rourke's *Seeking Alpha* article, ATG, Melechdavid, and O'Rourke engaged in early trading of Company C shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock. That trading included at least one matched trade, with Melechdavid submitting the buy order and ATG submitting the sell order for the same price at 9:38 a.m. The share price of Company C opened that day at $3.14 and reached $3.73 in the minutes before the promotion was released.

114.     The promotion was successful. The trading volume of Company C shares rose almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following the announcement of the Series E private placement. The volume increased to 858,709 on April 9, 2015, the day after O'Rourke's article was published. Company C's share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015. The Defendants listed below, acting pursuant to their agreement to buy, hold or sell their Company C shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million, as detailed below:

| Company C Pump and Dump Proceeds, Following April 2015 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2015)** | **Net Quantity Sold** | **Proceeds** |
| **Brauser** | 4/13 – 6/30 | (576,400) | $1,600,826.76 |
| **Groussman** and **Melechdavid** | 4/6 – 6/23 | (99,616) | $342,984.59 |
| **Stetson** and **HSCI** | 4/6 – 6/30 | (1,080,379) | $3,607,248.91 |
| **O'Rourke** and **ATG** | 4/8 – 6/30 | (30,064) | $69,744.51 |
| **Total** | | **(1,786,459)** | **$5,620,804.77** |

### 3.     *The Company C Pump and Dump in June/July 2015*

115.     In June 2015, when the market for Company C shares had cooled, O'Rourke recruited Ford to publish another Company C tout on Ford's blog. On July 1, 2015, Ford published an article titled "[Company C]: Near-Term Catalysts Could Push Shares from $2 to

over $5." The article contained materially false statements, including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were in early stages. Although, as before, Honig compensated Ford for writing the blog post, Ford did not disclose that he had been paid.

116.    Ford's article had the desired impact on the market: Company C trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015. Likewise Company C's share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015. Pursuant to their agreement to buy, hold or dispose of their shares in concert, the Defendants listed below sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million, as detailed below.

| Company C Pump and Dump Proceeds, Following June 2015 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2015) | Net Quantity Sold | Proceeds |
| **Brauser** | 7/1 – 10/7 | (363,050) | $749,025.45 |
| **Groussman** and **Melechdavid** | 7/15 – 12/18 | (212,034) | $243,250.96 |
| **Stetson** and **HSCI** | 7/1 – 12/7 | (682,539) | $1,525,588.49 |
| **O'Rourke** and **ATG** | 7/1 – 12/31 | (179,690) | $235,253.20 |
| **Total** | | **(1,437,313)** | **$2,753,118.10** |

117.    Honig and Stetson continued to invest in Company C and directed critical business choices for Company C. For example, on more than one occasion, Honig or Stetson directed Company C's CEO to name Honig's choice to Company C's board. On January 15, 2015, Honig and Stetson decided that Company C needed to employ different attorneys and shortly thereafter directed Company C's CEO which counsel to retain in connection with Company C's corporate filings. And on August 15, 2016, at Honig's and Stetson's direction, as a condition to HSCI providing additional financing to Company C, HSCI and Company C's CEO executed a letter agreement requiring Company C to hire the public relations firm that Honig and Stetson had selected.

### 4.    *False Beneficial Ownership Reports by Honig and Associates*

118.    Given the agreement among Honig, Brauser, Groussman, Frost, Stetson, and O'Rourke to buy, hold and/or dispose of their Company C shares in concert; the group's direction of Company C management and policies; and their combined share ownership, all of the members of the group were required to make Schedule 13D filings that they did not make. They did not make the appropriate filings so that the investing public would not discover their control over Company C, and to obscure from investors their planned pump-and-dump scheme.

119.    Stetson and HSCI were obligated to make a Schedule 13D filing as of July 2014, after Company C became public and they acquired beneficial ownership of more than 5% of Company C shares.  Similarly, as of the closing of the private placement financings in April 2015, Groussman (Melechdavid) and O'Rourke (ATG) were each obligated to make a Schedule 13D filing, disclosing their own respective holdings and that each was a member of the group because they were acting with one another and with Stetson, Honig, and Frost for the purpose of acquiring, holding or disposing of Company C shares, and collectively owned greater than 5% of Company C's outstanding shares.

120.    Even though Frost and FGIT acquired the Company C shares with an intention to control management, Frost and FGIT made a Schedule 13G filing on April 10, 2015 incorrectly indicating that they were passive investors.  Moreover, the Schedule 13G stated that Frost and FGIT had a 6.86% ownership percentage, and did not disclose they were working with Honig, Stetson, O'Rourke, Brauser, and Groussman, and that they, with the other members of their group, sought to direct and control management.  Nor did Frost file a Schedule 13D for Opko or Southern Biotech, in which those companies should have disclosed both their own holdings and that they, too, were each a member of the group.  Instead, Frost improperly made

four Schedule 13G/A filings on April 10, 2015, February 8, 2016, February 3, 2017, and January 18, 2018, ignoring the fact that he was ineligible to file a Schedule 13G because he was not a passive investor.

121.    Other Defendants who invested in Company C also improperly made Schedule 13G filings, notwithstanding that these Defendants were not passive investors, and also failed to disclose their membership in the group, in violation of an express disclosure requirement.  For example, Honig filed a Schedule 13G on February 17, 2017 disclosing only his 6.22% ownership through GRQ; Stetson filed a Schedule 13G on September 19, 2017, disclosing only his 5.64% ownership through HSCI, Brauser filed a Schedule 13G on February 2, 2017, disclosing only his 5.44% ownership through Grander.  Each of these Defendants should have made Schedule 13D filings because they were not passive investors, and each should have disclosed the existence of a group.  Additionally, a Schedule 13D filed by Stetson on February 12, 2018, a Schedule 13D filed by Honig on February 13, 2018, and a Schedule 13D/A filed by Honig on February 16, 2018 also failed to disclose the existence of a group.

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza)**

122.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

123.    By engaging in the acts and conduct described in this Complaint, Defendants Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company

C securities, have: (a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not

misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would

operate as a fraud or deceit upon any person.

124.     By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, GRQ,

Grander, HSCI, and Maza, directly or indirectly, singly or in concert, violated Section 10(b) of

the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a)(1)-(3) of the Securities Act**
**(Against Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza)**

125.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

126.     By engaging in the acts and conduct described in this Complaint, Defendants

Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, directly or indirectly,

singly or in concert, by use of the means or instruments of transportation or communication in

interstate commerce, in the offer or sale of Company A, Company B, and/or Company C

securities, have: (a) with scienter, employed devices, schemes, and artifices to defraud; (b)

knowingly, recklessly or negligently obtained money or property by means of any untrue

statements of a material fact or omitted to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading;

or (c) knowingly, recklessly or negligently engaged in transactions, practices, or courses of

business which operated or would operate as a fraud or deceit upon purchasers of securities of

Company A, Company B, and/or Company C.

39

127.     By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined, will continue to violate Sections 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)].

### THIRD CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against Frost, FGIT, Ford, Ladd, and Keller)**

128.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

129.     By engaging in the acts and conduct described in this Complaint, Defendants Frost, FGIT, Ford, Ladd, and Keller, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130.     By reason of the foregoing, Frost, FGIT, Ford, Ladd, and Keller, directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### FOURTH CLAIM FOR RELIEF
**Violations of Section 17(a)(2) of the Securities Act**
**(Against Frost, FGIT, Ford, Ladd, and Keller)**

131.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

132.     By engaging in the acts and conduct described in this Complaint, Defendants

Frost, FGIT, Ford, Ladd, and Keller, knowingly, recklessly or negligently, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, in the offer or sale of Company A, Company B, and/or Company C securities, have obtained money or property by means of any untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

133.    By reason of the foregoing, Frost, FGIT, Ford, Ladd, and Keller, directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### FIFTH CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**
**(Against ATG, Southern Biotech, and SCI)**

134.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

135.    By engaging in the acts and conduct described in this Complaint, Defendants ATG, Southern Biotech, and SCI, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have: (a) employed devices, schemes, or artifices to defraud; or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

136.    By reason of the foregoing, ATG, Southern Biotech, and SCI, directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

41

## SIXTH CLAIM FOR RELIEF
### Violations of Sections 17(a)(1) and (3) of the Securities Act
### (Against ATG, Southern Biotech, and SCI)

137.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

138.     By engaging in the acts and conduct described in this Complaint, Defendants

ATG, Southern Biotech, and SCI directly or indirectly,  singly or in concert, by use of the means

or instruments of transportation or communication in interstate commerce,  in the offer or sale of

Company A, Company B, and/or Company C securities, have (a) with scienter, employed

devices, schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in

transactions, practices, or courses of business which operated or would operate as a fraud or

deceit upon purchasers of securities of Company A, Company B, and/or Company C.

139.     By reason of the foregoing, ATG, Southern Biotech, and SCI, directly or

indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined,

will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)

and (3)].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section
### 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder
### (Against Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller)

140.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

141.     By engaging in the acts and conduct described in this Complaint, Defendants

Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller directly or indirectly, singly or

in concert, provided knowing and substantial assistance to Honig, Stetson, Brauser, and

O'Rourke, who, directly or indirectly, singly or in concert with others, in connection with the

42

purchase or sale of a security, with scienter, used the means or instrumentalities of interstate

commerce or of the mails or of a facility of a national securities exchange to (a) employ devices,

schemes, or artifices to defraud; and (b) engage in acts, practices, or courses of business which

operated or would operate as a fraud or deceit upon others.

142.     By reason of the foregoing, Frost, Groussman, FGIT, Melechdavid, Opko,

Ladd, and Keller, aided and abetted, and unless restrained and enjoined, will continue aiding and

abetting, Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-

5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Sections 17(a)(1) and (3) of the Securities Act
### (Against Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller)

143.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

144.     By engaging in the acts and conduct described in this Complaint, Defendants

Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller directly or indirectly, singly or

in concert, provided knowing and substantial assistance to Honig, Stetson, Brauser, and

O'Rourke, who, directly or indirectly, singly or in concert with others, in the offer or sale of a

security,  used the means or instruments of transportation or communication in interstate

commerce or used the mails to (a) with scienter employed devices schemes, and artifices to

defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses

of business which operated or would operate as a fraud or deceit upon purchasers of securities of

Company A, Company B, and/or Company C.

145.     By reason of the foregoing, Frost, Groussman, FGIT, Melechdavid, Opko,

Ladd, and Keller, aided and abetted, and unless restrained and enjoined, will continue aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## NINTH CLAIM FOR RELIEF
### Violations of Section 9(a)(1) of the Exchange Act
### (Against Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid)

146.   The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

147.   By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid, directly or indirectly, singly or in concert , by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange for the purpose of creating a false or misleading appearance of active trading in Company A, Company B and/or Company C securities, or a false or misleading appearance with respect to the market for Company A, Company B and/or Company C securities, entered an order or orders for the purchase and/or sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale and/or purchase of such security, had been or would be entered by or for the same or different parties.

148.   By virtue of the foregoing, Honig, Stetson, Brauser, O'Rourke, Groussman, ATG, and Melechdavid violated, and unless restrained and enjoined, will continue violating Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)].

### TENTH CLAIM FOR RELIEF
**Violations of Section 9(a)(2) of the Exchange Act**
**(Against Honig, O'Rourke, and ATG)**

149.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

150.     By engaging in the acts and conduct described in this Complaint, Defendants

Honig, O'Rourke, and ATG, directly or indirectly, singly or in concert , by use of the mails or

the means or instrumentalities of interstate commerce, or of a facility of a national securities

exchange effected, alone or with one or more other persons, a series of transactions in the

securities of Company A and/or Company B creating actual or apparent active trading in such

security, or raising or depressing the price of such security, for the purpose of inducing the

purchase or sale of such security by others.

151.     By virtue of the foregoing, Honig, O'Rourke, and ATG violated, and unless

restrained and enjoined, will continue violating Section 9(a)(2) of the Exchange Act [15 U.S.C. §

78i(a)(2)].

### ELEVENTH CLAIM FOR RELIEF
**Sale of Unregistered Securities in Violation of Sections 5(a) and (c) of the Securities Act**
**(Against Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha)**

152.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

153.     By engaging in the acts and conduct described in this Complaint, Defendants

Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha, directly or indirectly,

singly or in concert, made use of the means or instruments of transportation or communication in

interstate commerce or of the mails to offer or sell securities through the use or medium of a

prospectus or otherwise, or carried or caused to be carried through the mails or in interstate

45

commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable. The shares of Company A that Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha offered and sold as alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

154.    By reason of the foregoing, Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha have violated and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)].

## TWELTH CLAIM FOR RELIEF
### Violations of Section 13(d) of the Exchange Act and Rule 13d-1(a) Thereunder
### (Against Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI)

155.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

156.    Pursuant to Exchange Act Section 13(d)(1) and Rule 13d-1(a) thereunder, persons who directly or indirectly acquire beneficial ownership of more than 5% of a Section 12-registered class of equity securities are required to file a Schedule 13D, or, in limited circumstances, a Schedule 13G. Section 13(d)(3) plainly states that "act[ing] as a … group" in furtherance of acquiring, holding, or disposing of equity securities is enough to establish the group as a single "person." When a group is required to make a Schedule 13D filing, that group must "identify all members of the group."

157.    Defendants Honig, Stetson, Brauser, O'Rourke, Groussman, ATG, GRQ, Grander, Melechdavid, and SCI acquired and held beneficial ownership of more than 5% shares in Company B from on or about October 8, 2015 to at least on or about May 20, 2016.

158.    Honig, Stetson, and HSCI acquired and held beneficial ownership of more than

46

5% shares in Company C from on or about February 2014.

159.     Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about April 2015 to at least on or about December 2015.

160.     Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI were sufficiently interrelated that they constituted a group for the purposes of Exchange Act Section 13(d).

161.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the Company B and Company C securities, and failed to do so.

162.     By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI violated, and unless enjoined and restrained will continue to violate, Section 13(d)(1) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

### THIRTEENTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 13(a) of the Exchange Act and
Rules 12b-20 and 13a-1 Thereunder
(Against Ladd)**

163.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

164.     By engaging in the acts and conduct described in this Complaint, Company B violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R. §

240.12b-20] and 13a-1 [17 C.F.R. § 240.13a-1(a)] thereunder, which require issuers of registered

securities under the Exchange Act to file annual reports on Form 10-K with the Commission that,

among other things, do not contain untrue statements of material fact or omit to state material

information necessary in order to make the required statements, in the light of the circumstances

under which they are made, not misleading.

165.     By engaging in the acts and conduct described in this Complaint, Defendant

Ladd provided knowing and substantial assistance to Company B's filing of a materially false

and misleading annual report on Form 10-K.

166.     By reason of the foregoing, Ladd aided and abetted, and unless restrained and

enjoined, will continue aiding and abetting, Company B's violations of Section 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1(a)

thereunder [17 C.F.R. § 240.13a-1(a)], in violation of Section 20(e) of the Exchange Act [15

U.S.C. § 78t(e)].

## FOURTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 15(d) of the Exchange Act and
### Rule 15d-1 Thereunder
### (Against Maza and Keller)

167.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

168.     By engaging in the acts and conduct described in this Complaint, Company A

violated Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17

C.F.R. § 240.15d-1], which require issuers of registered securities under the Securities Act to file

annual reports on Form 10-K with the Commission that, among other things, do not contain

untrue statements of material fact or omit to state material information necessary in order to

make the required statements, in the light of the circumstances under which they are made, not

48

misleading.

169.     By engaging in the acts and conduct described in this Complaint, Defendants

Maza and Keller provided knowing and substantial assistance to Company A's filing of a

materially false and misleading annual report on Form 10-K.

170.     By reason of the foregoing, Maza and Keller aided and abetted, and unless

restrained and enjoined, will continue aiding and abetting, Company A's violations of Section

15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17 C.F.R. §

240.15d-1], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

<u>FIFTEENTH CLAIM FOR RELIEF</u>
**Violations of Section 17(b) of the Securities Act**
**(Against Ford)**

171.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

172.     By engaging in the acts and conduct described in this Complaint, Defendant

Ford directly or indirectly, singly or in concert,  by use of the means or instruments of

transportation or communication in interstate commerce, or by the use of the mails, in the offer

or sale of Company A, and/or Company C securities, has published, given publicity to, or

circulated any notice, circular, advertisement, newspaper, article, letter, investment service, or

communication which, though not purporting to offer a security for sale, described such security

for a consideration received or to be received, directly or indirectly, from an issuer, underwriter,

or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration

and the amount thereof.

173.     By reason of the foregoing, Ford, directly or indirectly, has violated, is

violating, and unless restrained and enjoined, will continue to violate Section 17(b) of the

Securities Act [15 U.S.C. § 77q(b)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following

relief, in a Final Judgment:

### I.

Finding that Defendants violated the federal securities laws and rules promulgated

thereunder as alleged against them herein;

### II.

Permanently restraining and enjoining Honig, Brauser, Frost, Groussman, Grander,

Melechdavid, and Alpha, their agents, servants, employees and attorneys and all persons in

active concert or participation with them who receive actual notice of the injunction by personal

service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a) and

(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

### III.

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost,

Groussman, Ladd, Maza, Keller, Ford, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko,

Southern Biotech, and SCI, their agents, servants, employees and attorneys and all persons in

active concert or participation with them who receive actual notice of the injunction by personal

service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)];

**IV.**

Permanently restraining and enjoining Ford, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)];

**V.**

Permanently restraining and enjoining Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

**VI.**

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost, Groussman, Ladd, Maza, Keller, Ford, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**VII.**

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost, Groussman, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or

otherwise, and each of them, from future violations of Section 13(d) of the Exchange Act [15

U.S.C. § 78m(d)] and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)];

## VIII.

Permanently restraining and enjoining Ladd, his respective agents, servants, employees

and attorneys and all persons in active concert or participation with them, who receive actual

notice of the injunction by personal service or otherwise, and each of them, from future

violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17

C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1];

## IX.

Permanently restraining and enjoining Maza and Keller, their respective agents, servants,

employees and attorneys and all persons in active concert or participation with them, who

receive actual notice of the injunction by personal service or otherwise, and each of them, from

aiding and abetting future violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]

and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1];

## X.

Permanently barring Ladd, Maza and Keller from acting as an officer or director of a

public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## XI.

Permanently prohibiting all Defendants from participating in any offering of penny stock

pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the

Exchange Act [15 U.S.C. § 78u(d)(6)].

## XII.

Ordering Defendants to disgorge all of the ill-gotten gains from the violations alleged in this complaint, and ordering them to pay prejudgment interest thereon;

## XIII.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

## XIV.

Granting such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury as to all issues so triable.

Dated: September 7, 2018
   New York, New York

       By:  *Sanjay Wadhwa*
          Sanjay Wadhwa
          Michael Paley
          Charu Chandrasekhar
          Nancy Brown
          Katherine Bromberg
          Jon Daniels
          Attorneys for Plaintiff
          SECURITIES AND EXCHANGE COMMISSION
          New York Regional Office
          200 Vesey Street, Suite 400
          New York, New York 10281-1022
          (212) 336-1023 (Brown)
          Email: BrownN@sec.gov

**EXHIBIT 2**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED: __1/10/2019__

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------ x
SECURITIES AND EXCHANGE COMMISSION, :
                               :
                 **Plaintiff,** :
                               :
          **-- against --** :           **18 Civ. 8175 (ER)**
                               :
BARRY C. HONIG, JOHN STETSON, :           **ECF CASE**
MICHAEL BRAUSER, JOHN R. O'ROURKE III, :
MARK GROUSSMAN, PHILLIP FROST, :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER, :
JOHN H. FORD, ALPHA CAPITAL ANSTALT, ATG :
CAPITAL LLC, FROST GAMMA INVESTMENTS :
TRUST, GRQ CONSULTANTS, INC., :
HS CONTRARIAN INVESTMENTS, LLC, :
GRANDER HOLDINGS, INC., MELECHDAVID, :
INC., OPKO HEALTH, INC., :
SOUTHERN BIOTECH, INC., and :
STETSON CAPITAL INVESTMENTS INC., :
                               :
                **Defendants.** :
------------------------------------------------------------------------ x

## FINAL JUDGMENT AS TO PHILLIP FROST

The Securities and Exchange Commission having filed a Complaint and Defendant Dr.

Phillip Frost having entered a general appearance; consented to the Court's jurisdiction over

Defendant and the subject matter of this action; consented to entry of this Final Judgment

without admitting or denying the allegations of the Complaint (except as to jurisdiction and

except as otherwise provided herein in paragraph VII); waived findings of fact and conclusions

of law; and waived any right to appeal from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating Section 17(a)(2) of the Securities Act of

1933 (the "Securities Act") [15 U.S.C. § 77q(a)(2)] in the offer or sale of any security by the use

of any means or instruments of transportation or communication in interstate commerce or by

use of the mails, directly or indirectly to obtain money or property by means of any untrue

statement of a material fact or any omission of a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).

II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating, directly or indirectly, Section 13(d) of the

Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78m(d)] and Rule 13d-1(a)

promulgated thereunder [17 C.F.R. § 240.13d-1(a)] by failing to file with the Commission a

statement containing the information required by Schedule 13D (as provided in 17 C.F.R. §

240.13d-101), within 10 days after acquiring directly or indirectly the beneficial ownership of

more than five percent of any equity security of a class which is specified in Exchange Act Rule

13d-1(i) [17 C.F.R. § 240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's

2

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] by, directly or indirectly, in the absence of any applicable exemption:

(a) Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b) Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c) Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock (which is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1]); provided, however, that such bar shall not prohibit Defendant from:

.    (a)    holding or selling the securities of, or providing additional funding to, any issuer whose securities are owned by Defendant as of the date of this Final Judgment; provided, however, that, any sale of securities hereafter shall be limited to the number of shares of such issuer held by Defendant as of the date of this Final Judgment, and, furthermore, for any additional funding provided by Defendant hereafter to any such issuer, Defendant shall receive debt securities with no current or future equity conversion feature;

(b)    making recommendations for consideration by management or the Board of Directors of OPKO Health, Inc. ("OPKO") regarding OPKO's current or future investments; or

(c)    participating in the issuance, offer, purchase, sale, or trading of the securities of OPKO, Ladenburg Thalmann Financial Services, Inc., Teva Pharmaceuticals, Inc., Castle Brands, Inc., or Vector Group, Ltd.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable

for disgorgement of $433,181.06, representing profits gained as a result of the conduct alleged in

the Complaint, together with prejudgment interest thereon in the amount of $90,206.46, and a

civil penalty in the amount of $5,000,000 pursuant to Section 20(d)(2) of the Securities Act [15

U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

Defendant shall satisfy this obligation by paying $5,523,387.52 to the Securities and Exchange

Commission within 14 days after entry of this Final Judgment.

 Defendant may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank

cashier's check, or United States postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

    Enterprise Services Center
    Accounts Receivable Branch
    6500 South MacArthur Boulevard
    Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; Dr. Phillip Frost as a defendant in this action; and specifying that payment is made

pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case

identifying information to the Commission's counsel in this action.  By making this payment,

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part

of the funds shall be returned to Defendant.  The Commission shall send the funds paid pursuant

to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after 14 days following entry of this Final Judgment. Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## IX.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated: <u>   January 10   </u>, <u> 2019 </u>

<u>                                     </u>
Edgardo Ramos, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------- x

SECURITIES AND EXCHANGE COMMISSION,                  :

                 Plaintiff,                  :

                 -- against --                  :

BARRY C. HONIG, JOHN STETSON,                  :
MICHAEL BRAUSER, JOHN R. O'ROURKE III,                  :
MARK GROUSSMAN, PHILLIP FROST,                  :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER,                  :
JOHN H. FORD, ALPHA CAPITAL ANSTALT, ATG                  :
CAPITAL LLC, FROST GAMMA INVESTMENTS                  :
TRUST, GRQ CONSULTANTS, INC.,                  :
HS CONTRARIAN INVESTMENTS, LLC,                  :
GRANDER HOLDINGS, INC., MELECHDAVID,                  :
INC., OPKO HEALTH, INC.,                  :
SOUTHERN BIOTECH, INC., and                  :
STETSON CAPITAL INVESTMENTS INC.,                  :

                 Defendants.                  :

--------------------------------------------------------------------- x

18 Civ. 8175 (ER)

ECF CASE

## CONSENT OF DEFENDANT PHILLIP FROST

     1.     Defendant Dr. Phillip Frost ("Defendant") acknowledges having been served with the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant and over the subject matter of this action.

     2.     Without admitting or denying the allegations of the complaint (except as provided herein in paragraph 11 and except as to personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of the final Judgment in the form attached hereto (the "Final Judgment") and incorporated by reference herein, which, among other things:

          (a)     permanently restrains and enjoins Defendant from violations of Sections

                  5(a) and (c), and 17(a)(2) of the Securities Act of 1933 ("Securities Act")

[15 U.S.C. §§ 77e(a) and (c) and 77q(a)(2)] and Section 13(d) of the Securities Exchange Act ("Exchange Act") [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)];

(b)    permanently bars Defendant from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], except as specified in the Final Judgment;

(c)    orders Defendant to pay disgorgement in the amount of $433,181.06, plus prejudgment interest thereon in the amount of $90,206.46;

(d)    orders Defendant to pay a civil penalty in the amount of $5,000,000 under Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

3.    Defendant agrees that he shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Defendant further agrees that he shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

4.    Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

5.     Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

6.     Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

7.     Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

8.     Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

9.     Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions. Defendant further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

10.     Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges

3

that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that he shall not be permitted to contest the factual allegations of the complaint in this action.

11.     Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations." As part of Defendant's agreement to comply with the terms of Section 202.5(e), Defendant: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant does not admit the allegations of the complaint, or that this Consent contains no admission of the allegations, without also stating that Defendant does not deny the allegations; and (iii) upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint; and (iv) stipulates solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code,

11 U.S.C. § 523, that the allegations in the complaint are true, and further, that any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under the Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19). If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket. Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

12.     Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action. For these purposes, Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

13.     Defendant agrees that the Commission may present the Final Judgment to the Court for signature and entry without further notice.

14.    Defendant agrees that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Final Judgment.

Dated: _12 - 12 - 18_

_____
Dr. Phillip Frost

On _Dec. 12_ , 2018, _Dr. Phillip Frost_ , a person known to me, personally appeared before me and acknowledged executing the foregoing Consent.

_____
Notary Public
Commission expires:

Notary Public State of Florida
Janie Lomas
My Commission GG 098665
Expires 07/29/2021

Approved as to form:

_____
Robert J. Anello, Esq.
Morvillo Abramowitz Grand Iason & Anello PC
565 Fifth Avenue
New York, NY  10017

Attorney for Defendant

# EXHIBIT 3

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED: ___1/10/2019___

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

SECURITIES AND EXCHANGE COMMISSION,　　　:

　　　　　　　　　　　　　　　　　　:

　　　　　　　　　　Plaintiff,　　　　:

　　　　　　　　　　　　　　　　　　:　　　**18 Civ. 8175 (ER)**

　　　　　　-- against --　　　　　　:

　　　　　　　　　　　　　　　　　　:　　　**ECF CASE**

BARRY C. HONIG, JOHN STETSON,　　　　:

MICHAEL BRAUSER, JOHN R. O'ROURKE III,　:

MARK GROUSSMAN, PHILLIP FROST,　　　:

ROBERT LADD, ELLIOT MAZA, BRIAN KELLER,　:

JOHN H. FORD, ALPHA CAPITAL ANSTALT, ATG　:

CAPITAL LLC, FROST GAMMA INVESTMENTS　:

TRUST, GRQ CONSULTANTS, INC.,　　　　:

HS CONTRARIAN INVESTMENTS, LLC,　　:

GRANDER HOLDINGS, INC., MELECHDAVID,　:

INC., OPKO HEALTH, INC.,　　　　　:

SOUTHERN BIOTECH, INC., and　　　　:

STETSON CAPITAL INVESTMENTS INC.,　　:

　　　　　　　　　　　　　　　　　　:

　　　　　　　　　　Defendants.　　　:

-------------------------------------------------------------------- x

**FINAL JUDGMENT AS TO OPKO HEALTH, INC.**

The Securities and Exchange Commission having filed a Complaint and Defendant OPKO Health, Inc. having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction); waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78m(d)] and Rule 13d-1(a)

promulgated thereunder [17 C.F.R. § 240.13d-1(a)] by failing to file with the Commission a statement containing the information required by Schedule 13D (as provided in 17 C.F.R. § 240.13d-101), within 10 days after acquiring directly or indirectly the beneficial ownership of more than five percent of any equity security of a class which is specified in Exchange Act Rule 13d-1(I) [17 C.F.R. § 240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay a civil penalty in the amount of $100,000 to the Securities and Exchange Commission pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. Defendant shall make this payment within 14 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; OPKO Health, Inc. as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant. The Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury. Defendant shall pay post-judgment interest on any delinquent amounts pursuant to 28 USC § 1961.

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein, including, but not limited to, the undertakings to:

a.     Establish a "Management Investment Committee" that will make recommendations to an "Independent Investment Committee" of the Board of Directors to handle existing and future strategic minority investments for so long as Dr. Phillip Frost ("Frost") is a shareholder in or holds any management or board-level position at Defendant.

b.     Within thirty (30) days of the date hereof, retain an Independent Compliance Consultant ("ICC"), not unacceptable to the Commission staff to do the following:

(i)     Review, within forty-five (45) days of retention, prior strategic minority investments by Defendant made at the suggestion of and in tandem with Frost and advise Defendant on whether filings under Exchange Act Section 13(d) in connection with such investments should be made or amended on the basis of a grouping of such investments by Defendant and Frost, Frost Gamma Investments Trust, The Frost Group LLC, and/or any members of Frost's immediate family.

3

(ii)     Review, within forty-five (45) days of retention,  Defendant's existing policies and procedures to determine whether they  are sufficient to ensure compliance with Exchange Act Section 13(d).

(iii)    Review, within forty-five (45) days of retention, the independence of the Management Investment Committee and Independent Investment Committee of the Board of Directors solely for purposes of the handling of strategic minority investments.

(iv)    Report, within fifteen (15) days of completion of the ICC's work, findings on the issues set forth in Paragraphs III(b)(i)–(iii) above (including recommendations as to filings, amendments, improvements to policies and procedures and improvements to composition of the Management Investment Committee and Independent Investment Committee of the Board of Directors) to the Commission staff.

c.     Implement, within thirty (30) days of receipt of the ICC's report, the ICC's recommendations.

d.     Certify, in writing, compliance with the undertakings set forth above.  The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance.  The Commission staff may make reasonable requests for further evidence of compliance, and Defendant agrees to provide such evidence.  Defendant shall submit the certification and supporting material to Michael Paley, Esq., with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60) days from the date of the completion of the undertakings.

## IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

V.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated: ___January 10___, __2019__

_____

**Edgardo Ramos, U.S.D.J.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x
SECURITIES AND EXCHANGE COMMISSION,        :
                                                                                   :
                                                 Plaintiff,                 :
                                                                                   :        18 Civ. 8175 (ER)
                             -- against --                                 :
                                                                                   :        ECF CASE
BARRY C. HONIG, JOHN STETSON,                          :
MICHAEL BRAUSER, JOHN R. O'ROURKE III,         :
MARK GROUSSMAN, PHILLIP FROST,                      :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER,       :
JOHN H. FORD, ALPHA CAPITAL ANSTALT, ATG      :
CAPITAL LLC, FROST GAMMA INVESTMENTS          :
TRUST, GRQ CONSULTANTS, INC.,                          :
HS CONTRARIAN INVESTMENTS, LLC,                     :
GRANDER HOLDINGS, INC., MELECHDAVID,           :
INC., OPKO HEALTH, INC.,                                         :
SOUTHERN BIOTECH, INC., and                              :
STETSON CAPITAL INVESTMENTS INC.,                 :
                                                                                   :
                                                 Defendants.             :
------------------------------------------------------------------------- x

## CONSENT OF DEFENDANT OPKO HEALTH, INC.

1.      Defendant OPKO Health, Inc. ("Defendant") acknowledges having been served

with the complaint in this action, enters a general appearance, and admits the Court's jurisdiction

over Defendant and over the subject matter of this action.

2.      Without admitting or denying the allegations of the complaint (except as to

personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to

the entry of the final Judgment in the form attached hereto (the "Final Judgment") and

incorporated by reference herein, which, among other things:

(a)      permanently restrains and enjoins Defendant from violations of Section

13(d) of the Securities Exchange Act ("Exchange Act") [15 U.S.C. §

78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)];

(b)     requires Defendant to comply with the undertakings set forth in this

Consent and incorporated in the Final Judgment; and

(c)     orders Defendant to pay a civil penalty in the amount of $100,000 under

Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].

3.     Defendant agrees that it shall not seek or accept, directly or indirectly,

reimbursement or indemnification from any source, including but not limited to payment made

pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays

pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof

are added to a distribution fund or otherwise used for the benefit of investors.  Defendant further

agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any

federal, state, or local tax for any penalty amounts that Defendant pays pursuant to the Final

Judgment, regardless of whether such penalty amounts or any part thereof are added to a

distribution fund or otherwise used for the benefit of investors.

4.     Defendant undertakes to:

(a)     Establish a "Management Investment Committee" that will make

recommendations to an "Independent Investment Committee" of the

Board of Directors to handle existing and future strategic minority

investments for so long as Dr. Phillip Frost ("Frost") is a shareholder in or

holds any management or board-level position at Defendant.

(b)     Within thirty (30) days of the date of the Final Judgment, retain an

Independent Compliance Consultant ("ICC"), not unacceptable to

Commission staff to do the following:

(i)     Review, within forty-five (45) days of retention, prior
strategic minority investments by Defendant made at the

2

suggestion of and in tandem with Frost and advise Defendant on whether filings under Exchange Act Section 13(d) in connection with such investments should be made or amended on the basis of a grouping of such investments by Defendant and Frost, Frost Gamma Investments Trust, The Frost Group LLC, and/or any members of Frost's immediate family.

(ii)    Review, within forty-five (45) days of retention, Defendant's existing policies and procedures to determine whether they are sufficient to ensure compliance with Exchange Act Section 13(d).

(iii)    Review, within forty-five (45) days of retention, the independence of the Management Investment Committee and Independent Investment Committee of the Board of Directors solely for purposes of the handling of strategic minority investments.

(iv)    Report, within fifteen (15) days of completion of the ICC's work, findings on the issues set forth in Paragraphs 4(b)(i)-(iii) above (including recommendations as to filings, amendments, improvements to policies and procedures and improvements to composition of the Management Investment Committee and Independent Investment Committee of the Board of Directors) to Commission staff.

(c)    Implement, within thirty (30) days of receipt of the ICC's report, the ICC's recommendations.

(d)    Certify, in writing, compliance with the undertakings set forth above.  The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance.  The Commission staff may make reasonable requests for further evidence of compliance, and Defendant agrees to provide such evidence.  Defendant shall submit the certification and supporting material to Michael Paley, Esq., with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60)

days from the date of the completion of the undertakings.

5.      Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

6.      Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

7.      Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

8.      Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

9.      Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

10.     Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions.  Defendant further agrees to provide counsel for the Commission, within thirty (30) days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

11.     Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or

representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that it shall not be permitted to contest the factual allegations of the complaint in this action.

12.     Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations." As part of Defendant's agreement to comply with the terms of Section 202.5(e), Defendant: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant does not admit the allegations of the complaint, or that this Consent

contains no admission of the allegations, without also stating that Defendant does not deny the allegations; and (iii) upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint.  If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket.  Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

13.     Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action.  For these purposes, Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

14.     Defendant agrees that the Commission may present the Final Judgment to the Court for signature and entry without further notice.

15.    Defendant agrees that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Final Judgment.

OPKO HEALTH, INC.

Dated: _12/14/18_        By:    _____

Steven D. Rubin
Executive Vice President, Administration
4400 Biscayne Blvd.
Miami, FL 33137

On December 14, 2018, Steven D. Rubin, a person known to me, personally appeared before me and acknowledged executing the foregoing Consent with full authority to do so on behalf of OPKO Health, Inc. as its Executive Vice President, Administration.



_____
Diana M. Rosado
Notary Public in and for the State of Florida
Commission expires: December 11, 2019

Approved as to form:

David Brodsky / MG                Matthew C. Solaraz / MG

David Brodsky, Esq.               Matthew C. Solomon, Esq.
Cleary Gottlieb Steen & Hamilton LLP   Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza                 2112 Pennsylvania Avenue, NW
New York, NY 10006                Washington, DC 20037

*Attorneys for Defendant*

7

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------- x

SECURITIES AND EXCHANGE COMMISSION, :

                **Plaintiff,** :

              – against – :

BARRY C. HONIG, MICHAEL BRAUSER, :
JOHN STETSON, JOHN R. O'ROURKE III, :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER, :
JOHN H. FORD, ATG CAPITAL LLC, GRQ :
CONSULTANTS, INC., HS CONTRARIAN :
INVESTMENTS, LLC, GRANDER HOLDINGS, INC., :
and STETSON CAPITAL INVESTMENTS INC., :
                   :
              **Defendants.** :

----------------------------------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED: _7/10/2019___

**18 Civ. 8175 (ER)**

**ECF CASE**

### JUDGMENT AS TO DEFENDANT BARRY C. HONIG

The Securities and Exchange Commission having filed a Complaint and Defendant Barry

C. Honig having entered a general appearance; consented to the Court's jurisdiction over

Defendant and the subject matter of this action; consented to entry of this Judgment without

admitting or denying the allegations of the Complaint (except as to jurisdiction and except as

otherwise provided herein in paragraph XI); waived findings of fact and conclusions of law; and

waived any right to appeal from this Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the

Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5

promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of

interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading; or

(c)     to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

### III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)], by using the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, for the purpose of creating a false or misleading appearance of active trading in any security, or with respect to the market for any security, to effect (a) any transaction in a security which involves no change in the beneficial ownership thereof, or (b) to enter an order or orders for the purchase of a security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security has been or will be entered by or for the same or different parties, or (c) to enter any order or orders for the sale of any security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security has been or will be entered by or for the same or

different parties.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)], by using the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, to effect, alone or with one or more other persons, a series of transactions in any security other than a government security or in connection with any security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

4

## V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1(a) promulgated thereunder [17 C.F.R. § 240.13d-1(a)] by failing to file with the Commission a statement containing the information required by Schedule 13D (as provided in 17 C.F.R. § 240.13d-101), within 10 days after acquiring directly or indirectly the beneficial ownership of more than five percent of any equity security of a class which is specified in Exchange Act Rule 13d-1(i) [17 C.F.R. § 240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)     Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)     Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or

instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)     Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock (defined as any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1] ("Penny Stock")).

VIII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently prohibited from, directly or indirectly:

(a)    holding any beneficial ownership in any issuer of Penny Stock that amounts to greater than 4.99 percent of that issuer's outstanding stock as calculated pursuant to Rule 13d-3(d)(1)(i) under the Exchange Act [17 C.F.R. § 240.13d-3(d)(1)(i)], provided, however, that such bar shall not apply to Defendant's holdings in PolarityTE, Inc. and Americas Silver Corp.;

(b)    advertising, marketing, or otherwise promoting any issuer of Penny Stock; causing the advertising, marketing or promotion of any issuer of Penny Stock; or deriving compensation from the advertising, marketing or promotion of any issuer of Penny Stock;

(c)    exercising control, including the power to direct or cause the direction of the management and policies, of any issuer of Penny Stock; and

(d)    providing funding to any issuer of Penny Stock, except funding that results in the issuance of debt securities with no current or future equity conversion feature; provided, however, that nothing herein shall prohibit Defendant from holding or selling the securities of any issuer of Penny Stock whose securities are owned by Defendant as of the date of this Judgment, so long as any sale by Defendant of any such securities, at such time as Defendant's direct or indirect beneficial ownership exceeds 4.99 percent of that issuer's outstanding stock as calculated pursuant to Rule 13d-3(d)(1)(i) under the Exchange Act [17 C.F.R. § 240.13d-3(d)(1)(i)], comports with the volume limitations set out in Rule 144(e) under the Securities Act [17 C.F.R. § 230.144(e)] regardless of whether Rule 144 would otherwise apply to any such sale and regardless of whether Defendant is an affiliate of the issuer.

IX.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. The Court shall determine the amounts of the disgorgement and civil penalty upon motion of the Commission. Prejudgment interest shall be calculated from September 23, 2013, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). In connection with the Commission's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion: (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of the Consent or this Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure. In connection with the Commission's motion for disgorgement and/or civil penalties, the parties may take discovery, including discovery from appropriate non-parties.

X.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

XI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

XII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.

XIII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

Dated:  July 10, 2019

_____
Edgardo Ramos, U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
SECURITIES AND EXCHANGE COMMISSION,   :

         Plaintiff,           :

        – against –        :

BARRY C. HONIG, MICHAEL BRAUSER,   :
JOHN STETSON, JOHN R. O'ROURKE III,  :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER, :
JOHN H. FORD, ATG CAPITAL LLC, GRQ  :
CONSULTANTS, INC., HS CONTRARIAN  :
INVESTMENTS, LLC, GRANDER HOLDINGS, INC.,:
and STETSON CAPITAL INVESTMENTS INC., :

        Defendants.     :
------------------------------------------------------------ x

18 Civ. 8175 (ER)

ECF CASE

## CONSENT OF DEFENDANT BARRY C. HONIG

1.     Defendant Barry C. Honig ("Defendant") acknowledges having been served with the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant and over the subject matter of this action.

2.     Without admitting or denying the allegations of the complaint (except as provided herein in paragraph 11 and except as to personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of the Judgment in the form attached hereto (the "Judgment") and incorporated by reference herein, which, among other things:

       (a)     permanently restrains and enjoins Defendant from violations of Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c) and 77q(a)] and Sections 9(a)(1) and (2), 10(b) and 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(1) and (2); 78j(b), 78m(d)] and Rules 10b-5 and 13d-1(a)

thereunder [17 C.F.R. §§ 240.10b-5 and 240.13d-1(a)]; and

(b) permanently bars Defendant from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)], and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], and, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], associated conduct as specified in the Judgment.

3. Defendant agrees that the Court shall order disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. Defendant further agrees that the amounts of the disgorgement and civil penalty shall be determined by the Court upon motion of the Commission, and that prejudgment interest shall be calculated from September 23, 2013, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). Defendant further agrees that in connection with the Commission's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion: (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of this Consent or the Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure. In connection with the Commission's motion for disgorgement and/or civil penalties, the parties may take discovery, including discovery from



appropriate non-parties.

4. Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

5. Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Judgment.

6. Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

7. Defendant agrees that this Consent shall be incorporated into the Judgment with the same force and effect as if fully set forth therein.

8. Defendant will not oppose the enforcement of the Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

9. Defendant waives service of the Judgment and agrees that entry of the Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions. Defendant further agrees to provide counsel for the Commission, within thirty days after the Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Judgment.

10. Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or



may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that he shall not be permitted to contest the factual allegations of the complaint in this action.

11. Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations." As part of Defendant's agreement to comply with the terms of Section 202.5(e), Defendant: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant does not admit the allegations of the complaint, or that this Consent contains no admission of the allegations, without also stating that Defendant does not deny the

4



allegations; (iii) upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint; and (iv) stipulates solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, that the allegations in the complaint are true, and further, that any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under the Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19). If Defendant breaches this agreement, the Commission may petition the Court to vacate the Judgment and restore this action to its active docket. Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

12.     Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action. For these purposes, Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

13.     In connection with this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party, Defendant (i) agrees to appear and be interviewed by Commission staff at such times and



places as the staff requests upon reasonable notice; (ii) will accept service by mail or facsimile

transmission of notices or subpoenas issued by the Commission for documents or testimony at

depositions, hearings, or trials, or in connection with any related investigation by Commission

staff; (iii) appoints Defendant's undersigned attorney as agent to receive service of such notices

and subpoenas; (iv) with respect to such notices and subpoenas, waives the territorial limits on

service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local

rules, provided that the party requesting the testimony reimburses Defendant's travel, lodging, and

subsistence expenses at the then-prevailing U.S. Government per diem rates; and (v) consents to

personal jurisdiction over Defendant in any United States District Court for purposes of

enforcing any such subpoena.

     14.     Defendant agrees that the Commission may present the Judgment to the Court for

signature and entry without further notice.

     15.     Defendant agrees that this Court shall retain jurisdiction over this matter for the

purpose of enforcing the terms of the Judgment.

Dated: _June 10, 2019_             _____

                                   Barry C. Honig

     On _June 10_, 2019, _Barry Honig_, a person known to me,
personally appeared before me and acknowledged executing the foregoing Consent.

                       _____

                    Notary Public
                    Commission expires:

LINETTE MARINUS
Notary Public - State of Florida
Commission # FF 989054
My Comm. Expires May 4, 2020

Approved as to form:

_____

Michael J. Osnato, Jr.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
212.455.3252

Attorney for Defendant

7